PUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

v.

ALI ASAD CHANDIA, a/k/a Abu
Qatada,

          *Defendant-Appellant.*

$\left.\rule{0pt}{5em}\right\}$ No. 06-4997

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Claude M. Hilton, Senior District Judge.
(1:05-cr-00401-CMH-1)

Argued: October 30, 2007

Decided: January 23, 2008

Before MICHAEL, MOTZ, and KING, Circuit Judges.

---

Affirmed in part, vacated in part, and remanded by published opinion. Judge Michael wrote the opinion, in which Judge Motz and Judge King joined.

---

## COUNSEL

**ARGUED:** Marvin David Miller, Alexandria, Virginia, for Appellant. John T. Gibbs, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Chuck Rosenberg, United States Attorney, David H. Laufman, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

**OPINION**

MICHAEL, Circuit Judge:

Ali Asad Chandia appeals from his conviction, after a jury trial, on three counts of providing material support to terrorists or terrorist organizations. *See* 18 U.S.C. §§ 2339A, 2339B. Chandia challenges his convictions on several grounds, although he does not contest the sufficiency of the evidence. He also argues that the district court erred in sentencing when it applied the terrorism enhancement under U.S.S.G. §3A1.4. We affirm Chandia's convictions but, because the district court failed to make the factual findings necessary to impose the §3A1.4 enhancement, we vacate the sentence and remand for resentencing.

I.

This case arises out of the government's investigation into an alleged terrorist support network based in the suburbs of Washington, D.C. Much of the investigation centered on individuals associated with the Dar al Arqam Islamic Center in Falls Church, Virginia, where a man named Ali Timimi was a lecturer and vocal supporter of violent jihad against the enemies of Islam.[1] Chandia, the defendant in this case, is a Pakistani national who lived in Germantown, Maryland, and regularly attended Dar al Arqam in Falls Church.

The key event in the government's investigation (at least with respect to Chandia) occurred on May 8, 2003, when the FBI executed a search warrant covering six suburban D.C. residences, including Chandia's. The warrant was issued on the basis of an affidavit by FBI Special Agent John Wyman. Wyman asserted in his affidavit that the six men whose homes were targeted — Chandia, Masoud Khan, Hammad Abdur-Raheem, Donald Surratt, Caliph Abdur Raheem, and Mohammed Aatique — had participated in a training program, along with other members of Dar al Arqam, that used the game of paintball

---

[1]Ali Timimi (also known as Ali al-Timimi) was convicted in April 2005 by a jury in the Eastern District of Virginia on various charges, including soliciting others to levy war against the United States in violation of 18 U.S.C. § 373.

as a means to prepare for engaging in violent jihad. Wyman also asserted that several of those targeted, including Chandia, had traveled to Pakistan to attend military training camps run by Lashkar-e-Taiba (LET), an organization that the United States government designated as a foreign terrorist organization (FTO) in December 2001. (We examine the details of the Wyman affidavit more closely in part IV, where we consider Chandia's challenges to the affidavit's validity.)

The search of Chandia's residence uncovered a significant amount of information ultimately introduced at trial, including numerous e-mails between Chandia and a high-level LET official named Mohammed Ajmal Khan. Chandia was not home at the time the FBI agents executed the search warrant, but his wife informed the agents that he had driven a black Dodge Neon to work at Costco in Gaithersburg, Maryland. An agent then located the car and observed inside it materials potentially relevant to the investigation. Based on these observations and the information in the Wyman affidavit, the agents sought, and the magistrate issued, a second warrant authorizing a search of the car. That search also yielded items introduced against Chandia at trial, most notably a CD-ROM containing a video glorifying the September 11, 2001, attacks and those who perpetrated the attacks.

In June 2003 eleven people (but not Chandia) were indicted for various offenses related in part to their participation in the paintball training program. Chandia was the only one of the six men targeted in the May 8, 2003, search who was not charged in this indictment. Six of the eleven indicted ultimately pled guilty, two were acquitted, and three were convicted after a bench trial. *See United States v. Khan*, 461 F.3d 477 (4th Cir. 2006) (affirming the three convictions).

Chandia was separately charged in a four-count indictment in September 2005. He was charged with a conspiracy and a substantive count of providing material support to terrorists, in violation of 18 U.S.C. § 2339A, and a conspiracy and a substantive count of providing material support to a foreign terrorist organization, in violation of 18 U.S.C. § 2339B. Though Agent Wyman had alleged in his affidavit that Chandia participated in the paintball training program, the government abandoned that contention prior to indictment. Instead, the indictment charged, and the government pressed at trial, two basic

sets of allegations against Chandia. First, the government alleged that Chandia, at the urging of Ali Timimi, traveled to Pakistan in November 2001 to attend an LET training camp. The defense admitted that Chandia was in Pakistan from November 2001 to February 2002, but it claimed that the purpose of his trip was to provide care for his father, who underwent a thyroid operation, and to assist in the preparations for his brother's wedding. Second, the government alleged that during a series of events, occurring primarily between February 2002 and April 2003, Chandia provided material support to Mohammad Ajmal Khan (Ajmal Khan), an LET official whom Chandia allegedly met while in Pakistan. Specifically, the government alleged that Ajmal Khan traveled to the United States to secure high-tech equipment and other materials for LET and that Chandia provided material support to Ajmal Khan during his trips. The alleged material support included picking up Ajmal Khan at the airport, providing him access to a computer and e-mail at Chandia's residence, and assisting him in shipping paintballs to Pakistan for LET use in military training operations. The defense acknowledged Chandia's relationship with Khan but claimed Chandia was unaware of Khan's association with LET.

The jury convicted Chandia on three counts and acquitted him on the substantive § 2339A count of providing material support to terrorists. The government appears to concede that the acquittal on the one count serves as a rejection of its contention that Chandia attended an LET training camp while in Pakistan.

At sentencing the government sought the terrorism enhancement under U.S.S.G. §3A1.4. A conviction under the material support statutes provides a base level guidelines range of 63-78 months' imprisonment for those, like Chandia, with no criminal history. *See* U.S.S.G. §2M5.3. Application of the terrorism enhancement, however, increases Chandia's guidelines range to 360 months to life. Chandia argued that the terrorism enhancement was not warranted in his case and, in addition, contested several factual assertions in the presentence report (PSR). The district court did not resolve the factual disputes and did not explicitly state that the terrorism enhancement applied, but the court did conclude in its oral disposition that Chandia's guidelines range was "properly assessed at . . . 360 months to life." J.A. 2384. Ultimately, the district court sentenced Chandia to

a total of 180 months in prison, which equals the statutory maximum for a single material support conviction.[2]

Chandia now appeals. He advances several challenges to his conviction, although he does not contest the sufficiency of the evidence on any of the three counts for which he was convicted. In addition, Chandia challenges the district court's application of the terrorism enhancement in determining his sentence.

## II.

We turn first to Chandia's argument that 18 U.S.C. § 2339B is unconstitutional. This argument runs squarely into our decision in *United States v. Hammoud*, 381 F.3d 316 (4th Cir. 2004), which upheld § 2339B against several constitutional challenges that mirror those advanced here by Chandia. First, Chandia's argument that § 2339B violates the First Amendment right of association is foreclosed by *Hammoud*, which rejected a similar argument because the statute "does not prohibit mere association; it prohibits the *conduct* of providing material support to a designated FTO." 381 F.3d at 329. Second, Chandia advances a series of related arguments — based on principles or doctrines ranging from due process to nondelegation of congressional authority — that boil down to a contention that § 2339B is unconstitutional because it empowers the executive to designate LET as an FTO (a designation that Chandia cannot challenge). These arguments fail under *Hammoud*'s holding that a criminal defendant's inability to challenge the FTO designation does not violate his constitutional rights because "the *fact* of an organization's designation as an FTO is an element of § 2339B, but the *validity* of the designation is not." 381 F.3d at 331.

---

[2]The district court imposed the statutory maximum on each count, which it found to be 60 months for the § 2339A count and 180 months for the § 2339B counts. The court chose (without explanation) to run the sentences concurrently, although it could have run them consecutively in order to impose a total punishment within the guidelines range of 360 months to life. *See* U.S.S.G. § 5G1.2 cmt. n.1. The government did not cross-appeal any aspect of the sentence.

Our decision in *Hammoud* also precludes Chandia's argument that § 2339B cannot be applied against him because certain terms related to the definition of a "terrorist organization" are vague. *See* 18 U.S.C. § 2339B(g)(6) (defining "terrorist organization" as "an organization designated as a terrorist organization" under the procedures established in 8 U.S.C. § 1189). Even if we assume for argument's sake that certain terms in the definition are vague, that circumstance would be relevant only to an organization seeking to challenge the validity of its own designation. As we held in *Hammoud*, the mere fact of designation, rather than the designation's validity, is what is relevant to a defendant (such as Chandia) who stands accused of providing material support. 381 F.3d at 331.

### III.

Chandia argues that the three counts for which he was convicted are multiplicitous or violate the Double Jeopardy Clause. We agree with the government that conviction on all three counts was permissible because "[e]ach offense contains one statutorily-mandated element that the other[s] [do] not, and Congress has not expressed a clear intention that multiple punishment not be imposed." *United States v. Terry*, 86 F.3d 353, 355 (4th Cir. 1996).

When a single course of conduct violates multiple statutes, multiple punishments may be imposed without violating the Double Jeopardy Clause, if that is what Congress intended. *Terry*, 86 F.3d at 355 (citing *Albernaz v. United States*, 450 U.S. 333, 344 (1981)). Our only task is to determine whether Congress intended to impose multiple punishments. We begin the inquiry into legislative intent by examining "whether proof of each crime 'requires proof of an additional fact which the other does not.'" *Terry*, 86 F.3d at 355 (quoting *Blockburger v. United States*, 284 U.S. 299, 304 (1932)). If the statutory elements "do not overlap, then multiple punishments are presumed to be authorized absent a clear showing of contrary Congressional intent." *Terry*, 86 F.3d at 356.

The elements of the separate crimes charged under § 2339A and § 2339B do not overlap. Section 2339B requires proof that Chandia provided material support to an organization designated as a foreign terrorist organization. By contrast, § 2339A requires proof that

Chandia provided material support or resources that he knew would "be used in preparation for, or in carrying out, a violation of [18 U.S.C. § 956]," which prohibits conspiracies to injure persons or damage property outside the United States. Because each statute requires proof of an element that the other does not, we presume that Congress authorized multiple punishments.

Chandia has not made the showing of clear congressional intent necessary to overcome this presumption. The sole support cited for his argument is congressional testimony given in April 2005 by Barry Sabin, a Justice Department official. Sabin's testimony purportedly suggests that material support cases are typically prosecuted under § 2339A prior to an organization's designation as a foreign terrorist organization and under § 2339B after designation. This testimony was given well after the passage of the statutes in question and, therefore, sheds no light on legislative intent.

We also disagree with Chandia's argument that Congress did not intend to authorize multiple punishments for a conspiracy and a substantive violation under § 2339B. Chandia's argument is based on the language of the statute, which prohibits the conspiracy and the actual provision of material support in the same section. *See* 18 U.S.C. § 2339B(a)(1)("Whoever knowingly provides material support . . . or attempts or conspires to do so . . ."). But, as the Supreme Court has held, the "settled principle" that "the commission of the substantive offense and a conspiracy to commit it are separate and distinct offenses" does not give way simply because the statute describing the substantive offense also specifically prohibits conspiracies. *Callanan v. United States*, 364 U.S. 587, 593 (1961).

IV.

Chandia contends that the district court should have suppressed evidence obtained during the May 8, 2003, searches of his residence and automobile.

A.

Chandia argues that evidence from searches of his residence and automobile should have been suppressed primarily because the

Wyman affidavit supporting those searches contained false and misleading statements as well as material omissions. Specifically, Chandia argues that the Wyman affidavit omitted information, obtained by the government in its investigation, that would have negated probable cause with respect to Chandia by showing that he did not participate in the paintball training program.

This argument would typically be evaluated under the Supreme Court's decision in *Franks v. Delaware*, 438 U.S. 154 (1978), which defines the circumstances when a defendant can attack a facially sufficient affidavit. Under *Franks* a defendant can obtain an evidentiary hearing on an affidavit's integrity by making "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit." *United States v. Colkley*, 899 F.2d 297, 300 (4th Cir. 1990) (quoting *Franks*, 438 U.S. at 155-56). A *Franks* hearing is also warranted if the defendant makes a substantial showing that the "affiant[ ] omit[ted] material facts with the intent to make, or in reckless disregard of whether they thereby made, the affidavit misleading." *Colkley*, 899 F.2d at 300 (internal quotation marks omitted). Ultimately, suppression under *Franks* is called for if the district court determines that the affidavit contained false or misleading statements or omissions that were "essential to the probable cause determination." *Id.*

In his motion to suppress filed in district court, Chandia did not expressly request a *Franks* hearing. Therefore, we review for plain error the issue of whether the district court should have held such a hearing. *See* Fed. R. Crim. P. 52(b); *United States v. Olano*, 507 U.S. 725, 731-32 (1993). In his motion to suppress Chandia asserted that the Wyman affidavit was tainted by false statements and material omissions. But these bare allegations did not entitle Chandia to a *Franks* hearing. Rather, to make the "substantial preliminary showing" required by *Franks*, a defendant's "allegations [of *Franks*-type misconduct] must be accompanied by an offer of proof." *Franks*, 438 U.S. at 171. For instance, "[a]ffidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained." *Id.* Because Chandia did not make the required offer of proof in support of his allegations of misconduct, the district court did not err in omitting a *Franks* hearing.

B.

Our inquiry does not end simply because Chandia is not entitled to relief under *Franks*. Suppression would still be warranted if the information contained in the Wyman affidavit was not sufficient to establish probable cause to search Chandia's residence. In addition to his *Franks*-like claims of deliberate falsehoods and material omissions, Chandia asserts (albeit somewhat indirectly) that the affidavit is inadequate because some of its most important allegations are "bare conclusions" lacking any independent basis in fact. *See Illinois v. Gates*, 462 U.S. 213, 239 (1983) (magistrate's probable cause determination "cannot be a mere ratification of the bare conclusions of others"). Because we give "great deference" to a magistrate's probable cause decision, our review is limited to determining whether there was "a substantial basis for the [magistrate's] decision." *United States v. Hurwitz*, 459 F.3d 463, 473 (4th Cir. 2006) (internal quotation marks omitted).

Chandia first takes issue with several statements in the affidavit that link him to the paintball training program. Specifically, Agent Wyman included in his affidavit a statement from a confidential informant, Ibrahim al-Hamdi, that a man named "Ali Asad," who lived in Maryland and attended the Dar al Arqam Islamic Center in Falls Church, participated in paintball. Wyman also stated that he (Wyman) believed that this "Ali Asad" was in fact Ali Asad Chandia. Chandia argues that Wyman's belief was unsupported and should not have been relied upon in the probable cause calculus. We disagree. Even if ultimately proven erroneous, Wyman's belief was not a bare conclusion advanced with no supporting facts. Instead, the magistrate could have deemed the belief reasonable based on the facts in the affidavit demonstrating that Chandia likewise lived in Maryland, attended Dar al Arqam, and associated with other paintball participants.

Chandia also objects to the affidavit's inclusion of a statement from another confidential informant, Yong Kwon, suggesting that Chandia attended an LET training camp in Pakistan. The affidavit stated that Kwon had seen Chandia at an LET office in Pakistan soon after Kwon had attended an LET training camp. (The affidavit included information confirming that Chandia was in Pakistan at the relevant time.)

The affidavit further stated that Kwon believed, based on his conversation with Chandia at that LET office and his prior knowledge of Chandia from Dar al Arqam, that Chandia planned to attend the camp as well. The affidavit did not, however, flesh out the details of the conversation which led Kwon to form this belief. As a result, we believe that Kwon's statement, considered alone, could not support a probable cause determination. But we see no reason why the magistrate was not permitted to rely on this statement as one part of the probable cause calculus. When we consider Kwon's statement beside the other information in the affidavit, particularly that Chandia's conversation with Kwon occurred at an LET office in Pakistan, that Chandia was confirmed to be in Pakistan during the relevant time frame, and that other information suggested that Chandia participated in paintball, we have no basis to second-guess the magistrate's determination that the affidavit demonstrated probable cause.

### C.

Chandia also argues that the agents conducted an impermissible general search of his residence that exceeded the scope authorized by the warrant. This argument, too, lacks merit. Chandia does not identify any item that was outside the scope of the warrant but was nonetheless seized and introduced against him at trial. Instead, he apparently contends that the purported breadth of the search justifies blanket suppression of all items seized. Blanket suppression due to an overly broad general search is only justified when officers exhibit flagrant disregard for the terms of the warrant. *United States v. Foster*, 100 F.3d 846, 849 (10th Cir. 1996); *see also United States v. Squillacote*, 221 F.3d 542, 556 (4th Cir. 2000) (the "extraordinary remedy of blanket suppression" has applied only when officers have seized "large quantities of evidence clearly not within the scope of the warrant"). After comparing the scope of the warrant with the lists of the items seized, we find no basis for concluding that the officers in this case flagrantly disregarded the terms of the warrant.

### D.

We also reject Chandia's argument that, even if the search of his residence was supported by probable cause, there was no nexus to support the second warrant for the search of his automobile. The

agent's plain view sighting of potentially relevant material inside the car, when combined with the additional information about Chandia contained in the Wyman affidavit, was sufficient to establish probable cause for the warrant authorizing the automobile search.

V.

We turn next to Chandia's contention that the district court committed reversible error by admitting into evidence two video clips from a CD-ROM found on the front seat in the search of Chandia's car. The clips, which together were approximately three minutes in length, glorify the September 11, 2001, attacks and those who perpetrated them, including Osama Bin Laden.

Chandia argues that video clips should have been excluded because they were not relevant under Federal Rule of Evidence 401, constituted barred character evidence under Rule 404, and were unfairly prejudicial under Rule 403. Chandia claims that a new trial is warranted because the clips were so powerful that their admission risked causing the jury to act on the basis of fear and hatred, rather than on a rational evaluation of the evidence.

We disagree. Even if admission of the video clips was error, it was harmless in this case. The clips were not a central part of the government's case; in fact, they took up only three minutes during the nearly five days the government spent presenting its case-in-chief. In addition, the clips were shown only once, were not used to frame the government's case at the trial, and were not unduly emphasized during the government's arguments to the jury. Most important, the central thrust of Chandia's prejudice argument — that the video clips were so overpowering that they caused the jury to convict based on emotion rather than the evidence presented — is discredited to a significant extent by the jury's rejection of one of the four counts charged in the indictment. The jury found Chandia not guilty on the substantive count that charged him with providing material support to terrorists. This outcome suggests that the jury conducted a rational evaluation of the evidence in reaching its verdict and was not misled by emotion.[3]

---

[3]Chandia makes a brief argument that the district court erred in denying certain pretrial discovery motions. He also argues that the district

VI.

Finally, Chandia contends that his sentencing proceedings were flawed. He argues first that the district court failed to resolve disputed issues of fact that were relevant to the application of the terrorism enhancement under U.S.S.G. §3A1.4. Alternatively, he argues that the facts of his case do not warrant application of the enhancement.

Application of the terrorism enhancement provides a twelve level enhancement — and an automatic criminal history category of VI — when the "offense is a felony that involved, or was intended to promote, a federal crime of terrorism." U.S.S.G. § 3A1.4. The key term, "a federal crime of terrorism," is defined to consist of two elements: (1) the commission of one of a list of specified felonies, which includes each of the material support offenses at issue in this case, and (2) a specific intent requirement, namely, that the underlying felony was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." 18 U.S.C. § 2332b(g)(5). In *Hammoud* we applied the terrorism enhancement in a material support case and held that the intent requirement was satisfied because the trial evidence established that the defendant provided the material support "with the intent to influence or coerce government conduct." 381 F.3d at 356.

In this case Chandia's PSR stated that the terrorism enhancement applied but gave no explanation for this conclusion. Chandia's convictions under the material support statutes clearly satisfied the first element of the enhancement. However, the PSR did not contain any factual assertions and the district court did not make any factual findings related to the intent element. Instead, both appeared to assume (erroneously) that the enhancement automatically applies to a material support conviction.

---

court erred in denying his request for a hearing under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), with respect to the government's expert witness on Islamic terrorism. These arguments fail because the district court did not abuse its discretion in any of the rulings cited by Chandia.

The government argues that we should nonetheless affirm the sentence. It attempts to rely on *Hammoud*, which affirmed application of the enhancement in a material support case based, among other things, on evidence that the defendant personally supported Hezbollah's violent activities. 381 F.3d at 356. But the government has not pointed to similar evidence here. Instead, it appears to suggest that we should infer the required intent from the basic facts that gave rise to the conviction. While it is true that Chandia did not (in his objections to the PSR) dispute the allegations that he provided support to Ajmal Khan by, for instance, helping him ship paintballs to Pakistan, these facts alone do not support application of the enhancement. Unlike in some cases where the enhancement has been applied, the acts underlying the conviction in this case were not violent terrorist acts. *See, e.g.*, *United States v. Mandhai*, 375 F.3d 1243 (11th Cir. 2004) (conspiracy to force changes in government policy by blowing up public utility structures). Therefore, these acts cannot, standing alone, support application of the terrorism enhancement. Because there has been no factual finding on the intent element, and because the basic facts supporting the conviction do not give rise to an automatic inference of the required intent, we must vacate Chandia's sentence and remand for resentencing.

On remand the district court may reconsider whether the enhancement should apply in this case. In doing so, the court must determine whether Chandia had the intent required by §3A1.4.[4] To make this determination, the court must resolve any factual disputes that it deems relevant to application of the enhancement. *See* Fed. R. Crim. P. 32(i)(3)(B). If the court finds that Chandia had the requisite intent, it should identify the evidence in the record that supports its determination.

\* \* \*

---

[4]This court has not decided whether the § 3A1.4 intent requirement must be found by clear and convincing evidence or merely by a preponderance. *See Hammoud*, 381 F.3d at 354-55 (discussing split of authority on the issue but not resolving it). We reserve consideration of this issue, both because it has not been briefed and because we will be in a better position to address it in a case where we are presented with relevant findings.

For the reasons stated above, we affirm Chandia's convictions but vacate his sentence and remand for resentencing.

*AFFIRMED IN PART,*
*VACATED IN PART,*
*AND REMANDED*