**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

        *Plaintiff-Appellee,*

v.

ALI ASAD CHANDIA, a/k/a Abu
Qatada,

        *Defendant-Appellant.*

No. 11-4323

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Claude M. Hilton, Senior District Judge.
(1:05-cr-00401-CMH-1)

Argued: January 24, 2012

Decided: April 6, 2012

Before NIEMEYER, MOTZ, and KING, Circuit Judges.

---

Affirmed by published opinion. Judge King wrote the opinion, in which Judge Niemeyer and Judge Motz joined.

---

**COUNSEL**

**ARGUED:** Marvin David Miller, Alexandria, Virginia, for Appellant. John T. Gibbs, UNITED STATES DEPART-MENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Neil H. MacBride, United States Attorney, Alexandria, Virginia, for Appellee.

---

**OPINION**

KING, Circuit Judge:

This proceeding is Ali Asad Chandia's latest appeal following his convictions in the Eastern District of Virginia for providing, and conspiring to provide, material support to terrorists and a foreign terrorist organization. *See* 18 U.S.C. §§ 2339A, 2339B. For the third time, Chandia challenges the district court's application of the sentencing enhancement for a "federal crime of terrorism" under Guidelines section 3A1.4 (the "terrorism enhancement") and his resultant sentence of 180 months in prison.

In his first appeal, we affirmed Chandia's convictions and remanded for a fresh analysis of whether the terrorism enhancement applies. *See United States v. Chandia*, 514 F.3d 365 (4th Cir. 2008) ("*Chandia I*"). Specifically, our *Chandia I* decision directed the sentencing court to determine whether Chandia had acted with the specific intent required by the terrorism enhancement. *Id.* at 376 (recognizing that, to satisfy the intent requirement, "the underlying felony [must have been] calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct" (internal quotation marks omitted)). "To make this determination," *Chandia I* explained, "the court must resolve any factual disputes that it deems relevant to application of the enhancement." *Id.* We specified that, "[i]f

the court finds that Chandia had the requisite intent, it should identify the evidence in the record that supports its determination." *Id.*

On remand, the district court again applied the terrorism enhancement and resentenced Chandia to 180 months in prison — but without fully resolving the factual disputes or sufficiently explaining how its findings related to Chandia's intent. Hence, in Chandia's second appeal, we again vacated his sentence and remanded for resentencing. *See United States v. Chandia*, 395 F. App'x 53 (4th Cir. 2010) ("*Chandia II*"). Our *Chandia II* decision reiterated our directive that the sentencing court "make clear that it has made independent findings" and, "[i]f it again finds application of the enhancement warranted, . . . explain how specific facts indicate that [Chandia's] motive in providing material support was to influence or affect government conduct by intimidation or coercion, or to retaliate against government conduct." *Id.* at 60.

Having carefully reviewed and assessed the sentencing proceedings prompting this third appeal, we are satisfied that the court has complied with our mandate. We therefore reject Chandia's contention that the court erred in applying the terrorism enhancement, plus his other assertions of procedural error, and we affirm his 180-month sentence.

I.

A.

Chandia's convictions were the product of a government investigation of a terrorist support network active in the suburbs of Washington, D.C. Among others investigated, Chandia, a Pakistani national, attended the Dar al-Arqam Islamic Center in Falls Church, Virginia. A lecturer at the Center, Ali Timimi, advocated violent jihad against the enemies of Islam. The FBI believed that several members of the Center were conducting jihad training with paintball guns.

The FBI also believed that some of the suspects, including Chandia, had travelled to Pakistan to attend military training camps operated by Lashkar-e-Taiba ("LET"), a designated foreign terrorist organization. In May 2003, the FBI executed warrants to search six residences, including Chandia's. The search of Chandia's residence and subsequent search of his vehicle "uncovered a significant amount of information ultimately introduced at trial." *See Chandia I*, 514 F.3d at 369-70.

In June 2003, eleven defendants targeted in the FBI searches — not including Chandia — were indicted for various offenses relating to their participation in the paintball training exercises. Of the eleven indicted, six "ultimately pled guilty, two were acquitted, and three were convicted after a bench trial." *Chandia I*, 514 F.3d at 370. Because Chandia did not participate in the paintball training, he was indicted separately, in September 2005, on four counts: "a conspiracy and a substantive count of providing material support to terrorists, in violation of 18 U.S.C. § 2339A, and a conspiracy and a substantive count of providing material support to a foreign terrorist organization, in violation of 18 U.S.C. § 2339B." *Id.*[1]

---

[1]Section 2339A required "proof that Chandia provided material support or resources that he knew would 'be used in preparation for, or in carrying out, a violation of 18 U.S.C. § 956,' which prohibits conspiracies to injure persons or damage property outside the United States." *Chandia I*, 514 F.3d at 372 (alterations omitted). The statute provides in pertinent part:

> Whoever provides material support or resources . . . , knowing or intending that they are to be used in preparation for, or in carrying out, a violation of [§] 956 . . . , or attempts or conspires to do such an act, shall be fined under this title, imprisoned for not more than 15 years, or both . . . .

18 U.S.C. § 2339A(a). Section 2339B required "proof of an element that [§ 2339A] does not," namely, "that Chandia provided material support to . . . a foreign terrorist organization." *Chandia I*, 514 F.3d at 372. The relevant part of that statute provides:

> Whoever knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, shall be fined under this title or imprisoned not more than 15 years, or both . . . .

18 U.S.C. § 2339B(a)(1).

At Chandia's trial, the government advanced "two basic sets of allegations against [him]": (1) "Chandia, at the urging of Ali Timimi, traveled to Pakistan in November 2001 to attend an LET training camp"; and (2) "between February 2002 and April 2003, Chandia provided material support to Mohammad Ajmal Khan . . . , an LET official whom Chandia allegedly met while in Pakistan." *Id.* More specifically, the prosecution maintained that Chandia provided material support during Khan's trips to the United States "to secure high-tech equipment and other materials for LET" by "picking up . . . Khan at the airport, providing him access to a computer and e-mail at Chandia's residence, and assisting [Khan] in shipping paintballs to Pakistan for LET use in military training operations." *Id.*

By its verdict of June 6, 2006, the jury acquitted Chandia of the § 2339A substantive count of providing material support to terrorists.[2] The jury convicted him, however, of the § 2339A conspiracy count plus the § 2339B substantive and conspiracy counts of providing material support to a foreign terrorist organization (collectively, the "material support convictions").

## B.

Prior to Chandia's first sentencing hearing, the probation officer prepared the presentence report (the "PSR"), recommending imposition of the terrorism enhancement.[3] Absent

---

[2]As we have observed and the government has conceded, "the acquittal on the one count serves as a rejection of [the] contention that Chandia attended an LET training camp while in Pakistan." *Chandia I*, 514 F.3d at 370.

[3]The terrorism enhancement applies when the "offense is a felony that involved, or was intended to promote, a federal crime of terrorism." USSG § 3A.1.4(a) (2005). As we explained in *Chandia I*,

   [t]he key term, "a federal crime of terrorism," is defined to con-
   sist of two elements: (1) the commission of one of a list of speci-

the enhancement, the advisory Guidelines range for Chandia, who had no criminal history, would have been 63 to 78 months in prison. *See Chandia I*, 514 F.3d at 370. Application of the terrorism enhancement, however, elevated Chandia's advisory Guidelines range to 360 months to life. *Id.* Although the PSR accurately reflected that the material support convictions satisfied the first element required for the enhancement — conviction of an enumerated felony — it provided no explanation concerning the second element — specific intent. Rather, the PSR merely concluded that the material support convictions "meet the requirements" for the terrorism enhancement. J.A. 895.[4]

Chandia objected to the PSR, disputing several of its factual assertions and observing that it failed to adequately address the application of the terrorism enhancement.[5] During

_____

fied felonies, which includes each of the material support offenses at issue in this case, and (2) a specific intent requirement, namely, that the underlying felony was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."

514 F.3d at 375-76 (quoting definition given to "a federal crime of terrorism" in 18 U.S.C. § 2332b(g)(5)(A)). If applicable, "the terrorism enhancement provides a twelve level enhancement — and an automatic criminal history category of VI." *Id.* at 375.

[4]Citations herein to "J.A.___" refer to the contents of the Joint Appendix filed by the parties in this appeal.

[5]We previously summarized Chandia's objections to the PSR as follows:

Chandia admitted that he was in Pakistan from November 2001 to February 2002 but claimed that he was there to care for his ill father and to prepare for his brother's wedding. [Further], he maintained that LET also engaged in non-terrorist activity such as the operation of schools and hospitals. [He] admitted to transporting [Mohammad] Khan, but he denied knowing that Khan was in the United States on LET business. Chandia argued that the computer that Khan used to order equipment did not belong

the first sentencing hearing, conducted in August 2006, the district court "did not explicitly state that the terrorism enhancement applied," but utilized the enhancement implicitly by determining that the Guidelines range was "properly assessed at . . . 360 months to life." *See Chandia I*, 514 F.3d at 371 (internal quotation marks omitted). The court nevertheless varied downward to a below-Guidelines sentence of 180 months in prison, the statutory maximum for a single material support conviction.

In *Chandia I*, we observed that the district court had not resolved Chandia's factual objections to the PSR, as Federal Rule of Criminal Procedure 32(i)(3)(B) required. *See* 514 F.3d at 376. Moreover, we recognized that the PSR failed to provide an explanation for application of the terrorism enhancement, and that the court made no factual findings relating to the specific intent element. *Id.* We rejected the notion, implicit in those errors, that the terrorism enhancement "automatically applies to a material support conviction." *Id.* Rather, we emphasized that, unlike cases in which the underlying conviction involves violent terrorist acts, the facts giving rise to Chandia's convictions did not alone yield "an automatic inference of the required intent." *Id.* Thus, we instructed the court to "resolve any factual disputes that it deems relevant to the application of the enhancement" under Rule 32(i)(3)(B). *Id.* If the court then concluded that the terrorism enhancement applied, it was to "identify the evidence in the record that supports its determination." *Id.*

## C.

No modifications were made to the PSR after the first remand, and Chandia did not file any new objections. At his

---

to Chandia personally but rather was in Chandia's residence and was used by multiple family members. Chandia admitted that he helped Khan ship approximately 50,000 paintballs to Pakistan, but denied purchasing or "clearing" the shipment.

*Chandia II*, 395 F. App'x at 56 (citations omitted).

second sentencing hearing in April 2008, Chandia neverthe-
less reminded the district court of his previously filed objec-
tions and contended that the terrorism enhancement was
unwarranted. The court disagreed, concluding that the
enhancement applied regardless of whether the government
had to prove specific intent by a preponderance or by clear
and convincing evidence. In deciding that the enhancement
applied, "the court relied upon the following facts":

> Chandia [visited websites] of LET; he spent time in
> Pakistan and visited LET offices in Pakistan; he met
> with [Mohammad] Khan, a "known leader of the
> LET"; he picked Khan up from the airport and his
> phone number served as Khan's contact; his com-
> puter was used to order Kevlar supplies from Can-
> ada; he took Khan to the airport to "make
> arrangements to buy other goods and military equip-
> ment"; and he helped ship paintballs to Pakistan.

*Chandia II*, 395 F. App'x at 57. "In sum, the court found that
Chandia 'knew the purpose of the LET organization, clearly
he knew it,' and thus the terrorism enhancement applied." *Id.*

Again, however, the sentencing court failed to address
Chandia's objections to the PSR, though in "its accompanying
Statement of Reasons the court indicated that it adopted the
PSR without change." *Chandia II*, 395 F. App'x at 57. The
court resentenced Chandia to 180 months in prison because
the material support convictions "were part and parcel of con-
duct that was charged in all three offenses." *Id.* (internal quo-
tation marks omitted).

In *Chandia II*, we observed that "the court did not fulfill
[its duty under Rule 32(i)(3)(B)] when it simply adopted the
PSR without change in its Statements of Reasons." 395 F.
App'x at 58. Although we explained that the court could
adopt the PSR's findings, it was required to "make clear on
the record that it has made an independent finding." *Id.* at 59

(internal quotation marks omitted). That is, the court was obliged to "indicate that it has considered Chandia's objections to the PSR and rejected them," and "then explain how its resolution of Chandia's objections affects" its finding of specific intent for the terrorism enhancement. *Id.* We discussed examples of specific factual disputes that could bear on the application of the terrorism enhancement, including: (i) whether Chandia knew that Mohammad Khan was a LET leader; (ii) whether Chandia intended to provide material support to advance LET's known terrorist or non-terrorist purposes; and (iii) whether Yong Kwon and Chandia discussed the training and gear requirements for the LET training camp in Pakistan.

We then explained that it was error for the sentencing court "to have applied the wrong legal standard by equating intent with knowledge." *Chandia II*, 395 F. App'x at 60. For instance, Chandia's knowledge that LET had a terrorist purpose supported his material support convictions but "that does not automatically yield an inference of the specific intent required for the [terrorism] enhancement to apply." *Id.* Accordingly, we again remanded, advising the court to "make clear that it has made independent findings in response to Chandia's objections to the PSR" and, "[i]f it again finds application of the enhancement warranted, [to] explain how specific facts indicate that [Chandia's] motive in providing material support" met the specific intent element. *Id.*

## D.

In the second remand proceedings, Chandia filed detailed objections to the PSR. The parties also provided the district court with supplemental briefing on the applicability of the terrorism enhancement and Chandia's PSR objections. During a resentencing hearing on January 28, 2011, the court considered each of Chandia's objections to the PSR, sustaining several of them and ordering the challenged paragraphs amended or deleted. Otherwise, the court overruled the objections and

adopted the PSR's findings. The parties then agreed to pro-
pose a consent order reflecting the court's PSR amendments
and deletions. At the conclusion of the hearing, the court
heard argument on the terrorism enhancement.

Subsequently, the district court entered the proposed con-
sent order, and the parties filed separate proposed findings of
fact on the terrorism enhancement. Chandia also submitted a
position statement on the amended PSR, maintaining, inter
alia, that the terrorism enhancement did not apply and that the
18 U.S.C. § 3553(a) factors merited a sentence of less than
180 months. Chandia presented other material support convic-
tion decisions, seeking to show that a 180-month sentence
would create an unwarranted disparity. On March 11, 2011,
at the outset of another sentencing hearing — Chandia's
fourth — the court announced that it would "relate [its] find-
ings in regard to the enhancement that's at issue and then
[impose the sentence]." J.A. 844. The court explained that it
was still convinced that the "facts support that [Chandia's]
motive in providing material support was to influence or
affect government conduct by intimidation or coercion or to
retaliate against government conduct[, and there were] numer-
ous facts which compel that conclusion." *Id.*

The sentencing court then identified evidence showing that
Chandia knew that LET was an organization engaging in acts
of terrorism, including the following:

- A January 12, 2001 email Chandia received "with
  the subject line 'training' . . . said, 'Brother, you
  requested some information about training and
  fighting inshallah.[ ] The two groups we have
  contact with are [LET and Mujihideen] the initial
  training at lashkar is three weeks, after that there
  are 3- or 4- month commando training
  courses,[']" J.A. 844-45;

- Husnain Awan's testimony that he and Chandia
  "looked at the websites online which described

information about LET's military operations in the Kashmir," *id.* at 845;

- Suhail Hafiz's testimony that Chandia "did research for him on the mindset of violent extremists, and in doing so, obtained a significant amount of material on the LET," *id.*;

- The testimony of Chandia's brother that Chandia "must have accessed the LET websites because they were talking about Kashmir all the time," *id.*;

- An email sent to Chandia and others on March 22, 2002, forwarded "a link to the Taiba-Bulletin[,] the official online news site for LET[,] where LET publicized its attacks against Indian forces," *id.*;

- Exhibits "recovered from [Chandia's] computer . . . contained selected text about LET's violent acts against the government of India," *id.*;

- A March 9, 2001 document recovered from Chandia's computer "read, '[LET], the military wing of the Pakistan-based Markaz Dawa wal Irshad (MDI), has been behind most of the recent incidents of terrorism in Jammu and Kashmir,'" *id.* at 845-46;

- Posters on the wall in the "LET office in Lahore where [Chandia visited] depict[ed] Indian and American flags with daggers going through them as well as posters with weapons and machine guns on them," *id.* at 846; and

- A news story" recovered from Chandia's computer "reported that the United States government

had designated LET as a foreign terrorist organi-
zation," *id.*

The court then proceeded to identify and describe the evi-
dence supporting the proposition that Chandia knew Moham-
mad Khan to be an LET leader, including:

• The fact that Chandia twice "went to the same
  LET office in Lahore that was used by [Ali]
  Timimi's disciples, [including Khan], as a gate-
  way to the LET training camps," J.A. 847;

• Yong Kwon's testimony that, before Chandia left
  the LET office in Lahore, he said "goodbye to
  Abu Osama[,] the LET official who facilitated
  Kwon's training with LET and shared a driver
  with both Khan and [another man] who was in
  charge of the LET office," *id.*;

• Khwaja Mahmood Hasan's testimony that he
  "had a conversation with [Chandia] and Khan on
  the driveway of his parents' home and . . . that
  'from the conversation I [Hasan] understood that
  he [Khan] was here for LET business." During
  that same conversation, Hasan "warned Khan to
  'be careful' because a group of Pakistanis in New
  York recently was 'caught trying to smuggle out
  night vision goggles,'" *id.* at 848;

• The fact that Chandia and Khan "always made
  sure to maintain a very low profile in their com-
  munications. They never used each other's real
  names. They kept messages short and cryptic.
  They wrote in ways that would be hard to deci-
  pher," *id.*;

• A June 9, 2002 email Chandia sent to Khan "with
  the subject line, 'Re: your friend,' which began,

' . . . Brother, I hope all is well. Where are you? How are the brothers? How is the situation? I have heard everything got shut. Is that true? I hope not,'" *id.* at 849;

- In assisting Khan with the shipment of paintballs to Pakistan, "Chandia sent Khan an e-mail in which he said, 'Dude, it's done. Here is response I received from the guy.' The response that Chandia forwarded to Khan[,] an e-mail from . . . IGS Shipping, reading in part, 'I just spoke to Saudi Cargo General Manager. Saudi Washington Dulles will send immediately to Saudi Lahore a telex asking them to release the shipment to the consignee.' The next day Chandia e-mailed Kahn to tell him, 'You will receive the document today. Just be patient for the next 8 to 9 hours,'" *id.* at 853; and

- A computer at the school where Chandia worked "was used on at least two occasions by username P-S-I-N-G-H 111@hotmail.com between March 21, 2003, and May 18, 2003. The hotmail account belonged to Khan, but Khan had already left the United States to travel to Pakistan by [March 21, 2003]," *id.*

The district court concluded by summarizing the significance of its factual findings, observing that

it is clear that [Chandia] knew LET was an organization that engaged in repeated acts of violence against the government of India, that [Chandia] knew that Mohammad Khan was an LET leader, that [Chandia], in his actions here and his support, intended to influence or affect government conduct by intimidation or coercion or to retaliate against government conduct.

J.A. 853. Consequently, the court deemed the terrorism enhancement "warranted and the guidelines properly assessed at a range of 360 months to life." *Id.* at 853-54. The court then invited Chandia to the podium and inquired, "Is there anything you want to say at this time?" *Id.* at 854. Chandia replied, "No." *Id.* At that point, the court, "considering the factors [required] under Section 3553, [determined] a sentence somewhat less than the lower end of the guidelines range would be appropriate in this case" and thus again imposed the variance sentence of 180 months in prison. *Id.* Chandia's counsel thereafter responded, "Your Honor, we will obviously, for the record, note our exception to the Court's ruling and finding[s] of fact. We adopt what we filed before." *Id.* at 855.

Chandia timely noted his appeal on March 19, 2011. We possess jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

## II.

We review the reasonableness of a sentence for abuse of discretion. *See United States v. Hornsby*, 666 F.3d 296, 312 (4th Cir. 2012). In undertaking such a review, we ensure that "the district court committed no significant procedural error," such as "failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the [18 U.S.C.] § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence — including an explanation for any deviation from the Guidelines range." *United States v. Diosdado-Star*, 630 F.3d 359, 363 (4th Cir. 2011) (internal quotation marks omitted).

In assessing a Guidelines enhancement, "we review findings of fact for clear error and legal decisions de novo." *United States v. Rooks*, 596 F.3d 204, 210 (4th Cir. 2010) (internal quotation marks omitted). Under the clear error stan-

dard of review, we "will only reverse if left with the definite and firm conviction that a mistake has been committed." *United States v. Slade*, 631 F.3d 185, 188 (4th Cir. 2011) (internal quotation marks omitted).

### III.

Chandia advances two sets of contentions in this appeal, both premised on the notion that the district court committed procedural errors at sentencing. First, he contends that the court erroneously applied the terrorism enhancement. In particular, Chandia asserts that the court should have utilized the more defendant-favorable clear and convincing standard of proof. He also maintains that certain of the court's factual findings were clearly erroneous. Otherwise, he argues that the facts relied on by the court fail to establish the requisite intent for the terrorism enhancement.

Second, Chandia contends that, notwithstanding the sufficiency of the factual predicates for the enhancement, its application in this case fails to comport with the purposes of the Guidelines and 18 U.S.C. § 3553(a). Had the court properly evaluated the § 3553(a) factors, Chandia posits, it would have regarded a sentence augmented by the terrorism enhancement as unreasonable. Indeed, he asserts that the court did not assess certain of the § 3553(a) factors, specifically his life history and characteristics and the need to avoid unwarranted sentencing disparities. Finally, Chandia contends that the court committed procedural error by depriving his attorney of the chance to address the appropriate sentence under § 3553(a). As explained below, we reject those contentions.

### A.

### 1.

First, Chandia faults the sentencing court for failing to decide the applicable standard of proof for the terrorism

enhancement.[6] He maintains that due process requirements demand a higher standard of proof — clear and convincing evidence as opposed to a preponderance — because the enhancement significantly increases his advisory Guidelines range (from a range of 63 to 78 months to a range of 360 months to life). For this proposition, Chandia relies primarily on a Third Circuit decision quoting Supreme Court dicta that a Guidelines enhancement that exponentially increases the recommended sentence "functions as 'a tail which wags the dog of the substantive offense'" and therefore should be proved by clear and convincing evidence. *See United States v. Kikumura*, 918 F.2d 1084, 1100-01 (3d Cir. 1990) (quoting *McMillan v. Pennsylvania*, 477 U.S. 79, 88 (1986)). The Third Circuit has since overruled *Kikumura*, however, relying on *United States v. Booker*, 543 U.S. 220 (2005). In so ruling, the court of appeals observed that, although "concerns about the 'tail wagging the dog' were valid [in *McMillan*] under a mandatory guideline system[, they] were put to rest when *Booker* rendered the Guidelines advisory." *United States v. Fisher*, 502 F.3d 293, 305 (3d Cir. 2007). "[U]nder an advisory system," the court explained, "facts relevant to enhancements . . . no longer increase the maximum punishment, but [will] simply inform the judge's discretion as to the appropriate sentence." *Id.* (internal quotation marks and alteration omitted).

Likewise, we have concluded that, post-*Booker*, "the due process clause does not require the district court to find uncharged conduct by a heightened standard of proof before using it as a basis for determining a defendant's sentence." *United States v. Grubbs*, 585 F.3d 793, 802 (4th Cir. 2009).

---

[6]Although the district court did not explicitly identify the standard of proof, it presumably decided, as it did on the first remand, that the terrorism enhancement applied regardless of whether the government had to prove it by a preponderance or by clear and convincing evidence. We previously declined to address the question because in the prior appeals we were not "presented with relevant findings." *Chandia I*, 514 F.3d at 376 n.4; *see also Chandia II*, 395 F. App'x at 57 n.1.

Rather, "[s]entencing courts continue to exercise their long-standing authority to hear the evidence, and consider any evidence at sentencing that 'has sufficient indicia of reliability.'" *Id.* (quoting USSG § 6A1.3(a)). We are entirely unpersuaded by Chandia's attempt to limit *Grubbs* to its facts, in that *Booker* nullified "[w]hatever theoretical validity may have attached to the *McMillan* [tail-wagging-the-dog] exception." *Grubbs*, 585 F.3d at 801. Accordingly, a preponderance of the evidence is the appropriate standard of proof for establishing the requisite intent for the terrorism enhancement. And, as explained further herein, that standard was satisfied here.

2.

Chandia next contends that three of the sentencing court's factual findings underpinning the terrorism enhancement were clearly erroneous. First, he asserts that, contrary to the court's finding, there was no evidence that he intended to participate in jihad training when he quit his job in the United States and travelled to Pakistan in November 2001. The court, however, recited evidence from which it could fairly draw such an inference, not the least of which was the January 12, 2001 email Chandia received "with the subject line 'training,'" which stated, "'Brother, you requested some information about training and fighting inshallah,'" and informed Chandia that LET was one of two groups offering "commando training courses." J.A. 844-45.

Second, Chandia disputes the court's description of emails he exchanged with Mohammad Khan as "cryptic," maintaining that the terminology and informal style of the emails are endemic to his generation's electronic communications. We are not convinced by that proposition, however, given the context of those particular exchanges. Even if we "would have weighed the evidence differently," we would not reverse because the "district court's account of the evidence is plausible in light of the record viewed in its entirety." *See Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985).

Third, Chandia disagrees with the court's inference that Chandia knew Mohammad Khan was in the United States for LET business, based on Khwaja Hasan's testimony of a conversation between the three men in February 2002. We previously explained that the PSR inaccurately asserted that "Khan told Hasan in Chandia's presence that he was in the United States on LET business." *Chandia II*, 395 F. App'x at 59. In fact, "Hasan conceded that Khan did not indicate to Hasan his purpose for being in the United States, nor did Hasan speculate on Khan's purpose in Chandia's presence." *Id.* Nevertheless, as the district court found in the second remand proceedings, Hasan derived his assumption that Khan was in the United States on LET business from the conversation the men had in Chandia's presence. Moreover, the court observed that, during the same conversation, Hasan specifically "warned Khan to 'be careful' because a group of Pakistanis in New York recently was 'caught trying to smuggle out night vision goggles.'" J.A. 848. In view of the foregoing, we are not left with the definite and firm conviction that the court clearly erred when it inferred from the evidence that Chandia knew Khan was in the United States on LET business. *Cf. United States v. Kiulin*, 360 F.3d 456, 460 (4th Cir. 2004) (concluding that sentencing court's inference from recorded conversation was not clearly erroneous and supported application of sentencing enhancement). Put simply, "[w]here there are two permissible views of the evidence, the [court's] choice between them cannot be clearly erroneous." *Anderson*, 470 U.S. at 574.

3.

Chandia also maintains that the sentencing court's factual findings, if not clearly erroneous, were nevertheless insufficient to establish the specific intent necessary for the terrorism enhancement. He contends that the court's findings on the second remand were not new, but rather that they were mere restatements of the facts sustaining the material support convictions — facts rejected in the prior appeals as inadequate to

demonstrate specific intent. But we did not require the court to make any *new* factual findings on remand, though it appears to have done so. Rather, we asked the court to make "*independent* findings in response to Chandia's objections to the PSR" and then "*explain* how specific facts indicate that [Chandia's] motive in providing material support" constituted the requisite intent for the terrorism enhancement. *Chandia II*, 395 F. App'x at 60 (emphasis added).

Consistent with *Chandia II*, the district court resolved each of Chandia's objections, made its own findings, and explained Chandia's motive for providing material support. In short, the court concluded that, because Chandia "knew LET was an organization that engaged in repeated acts of violence against the government of India," and because he knew that "Khan was an LET leader," his motivation in providing material support to Mohammad Khan was to "to influence or affect government conduct by intimidation or coercion or to retaliate against government conduct." J.A. 853. Chandia criticizes the court's explanation as simply reiterating that he knew that LET had terrorist purposes when he assisted Khan, which "does not automatically yield an inference of the specific intent required for the enhancement to apply." *Chandia II*, 395 F. App'x at 60. In this instance, however, the court was not "equating intent with knowledge." *Id.* The court instead followed our prescription to first resolve facts that "may bear on whether Chandia provided material support [with the requisite intent]." *See id.* at 59.

Most notably, the sentencing court found that Chandia knew that Khan was an LET leader. In fact, the court explained that "Chandia demonstrated that he knew Khan well and that he was much more than an unwitting assistant to this LET leader." J.A. 849. Over Chandia's objection, the court also adopted the PSR's recitation of Yong Kwon's testimony that "Chandia discussed with Kwon the training that occurred at the LET camp [and the necessary] clothing." *See id.* at 1024. As we advised, resolution of this and other factual

disputes enabled the court to find "motives attributable to Chandia under the terrorism enhancement." *See Chandia II*, 395 F. App'x at 60. The court surmised from the evidence that Chandia's "intent was to go [to Pakistan] to train and fight[, and] [w]hether he did so or not, he possessed a mindset that would make him a valuable asset to the LET." J.A. 851. Indeed, "almost immediately after returning to the United States," Chandia assisted Mohammad Khan knowing that he was there on LET business. *See id.* Hence, the court did not repeat the mistake of relying solely on Chandia's knowledge of LET's terrorist purpose; it reasonably inferred by a preponderance of the evidence that Chandia intended to advance that purpose in providing material support to Khan. *See United States v. Hammoud*, 381 F.3d 316, 356 (4th Cir. 2004) (affirming application of terrorism enhancement where defendant had "close connections with Hizballah officials," and his testimony indicated that he was "well aware of Hizballah's terrorist activities and goals and that he personally supported this aspect of Hizballah"), *vacated on other grounds*, 543 U.S. 1097 (2005).

## B.

Finally, Chandia contends that the district court committed procedural errors in imposing a sentence amplified by the terrorism enhancement without weighing all of the § 3553(a) factors and without providing him an opportunity to address them. Regarding the latter, Chandia acknowledges that the court asked him during the fourth and final sentencing hearing if there was anything he wanted to say before sentence was imposed. He asserts, however, that the court failed to accord his lawyer an opportunity to speak on his behalf. *See* Fed. R. Crim. P. 32(i)(4)(A)(i) (providing that, "[b]efore imposing sentence, the court must [afford] the defendant's attorney an opportunity to speak on the defendant's behalf"). Although the court did not specifically elicit remarks from Chandia's counsel, it is readily apparent that the lawyer had multiple opportunities to address the proper sentence, including the

§ 3553(a) factors. Indeed, Chandia's very able counsel inter-jected immediately after sentence had been orally imposed, taking "exception to the Court's ruling and finding[s] of fact [and to] adopt what we filed before." J.A. 855. In context, the lawyer's reference to what was "filed before" is significant.

In his earlier sentencing memoranda, Chandia's counsel had argued for a lower sentence based on the § 3553(a) fac-tors and attached several letters attesting to Chandia's good character. Additionally, the lawyer spoke to the court about Chandia's life history and characteristics during the resen-tencing hearing of January 28, 2011. Nevertheless, if the court somehow contravened Rule 32(i)(4)(A)(i), Chandia cannot show that such an error affected his substantive rights. *See United States v. Muhammad*, 478 F.3d 247, 249 (4th Cir. 2007) (reviewing unobjected-to denial of allocution by defen-dant for plain error). Chandia insists that his counsel — if he had spoken — would have reiterated facts that were raised at the January 28, 2011 hearing regarding the terrorism enhance-ment, he would have pointed out the government's factual errors and omissions, and he would have emphasized that Chandia was convicted of a conspiracy with property damage as its objective, rather than causing harm to individuals. We are entirely unconvinced that the court was oblivious to these points, or that they would have resulted in a lesser sentence. By the final sentencing hearing, the court was fully aware of the mitigating circumstances and of Chandia's various objec-tions to its factual findings. *Cf. Muhammad*, 478 F.3d at 250-51 (concluding defendant was prejudiced by denial of allocu-tion in post-*Booker* remand, because court had more discre-tion and could have imposed a lesser sentence had defendant been permitted to allocute for second time).

Likewise, we are satisfied that the district court, in fashion-ing its variance sentence, considered the § 3553(a) factors. The court was not required to provide a lengthy explanation or "robotically tick through § 3553(a)'s every subsection, par-ticularly when imposing a [below]-Guidelines sentence." *See*

*United States v. Powell*, 650 F.3d 388, 395 (4th Cir. 2011) (internal quotation marks omitted). Chandia nevertheless contends that the court failed to consider that he was the least culpable among his coconspirators yet received a greater sentence on the material support convictions. He relies on other cases where, according to him, the terrorism enhancement applied but the defendants received lesser sentences even though their conduct was more egregious. As we have explained, however, comparing the sentences of other defendants with dissimilar offenses, circumstances, and criminal histories is unavailing. *See United States v. Abu Ali*, 528 F.3d 210, 267 (4th Cir. 2008). Indeed, two of Chandia's coconspirators were convicted after a bench trial of numerous offenses and sentenced, respectively, to eighty-five years and life plus sixty-five years. *See* J.A. 1010-11.[7] In any event, "[e]ven if [Chandia's] sentence is more severe than average, that fact does not mean that it was unwarranted." *See United States v. Rivera-Santana*, 668 F.3d 95, 106 (4th Cir. 2012). Notably, although Chandia's advisory Guidelines range was 360 months to life, the court varied downward by 15 years to a 180-month sentence. Hence, the court plainly weighed the mitigating and aggravating factors and decided that the 180-month sentence served "the § 3553(a) factors, on a whole." *See Gall v. United States*, 552 U.S. 38, 51 (2007). In these circumstances, we are satisfied that the court did not err.

## IV.

Pursuant to the foregoing, we reject Chandia's appellate contentions and affirm.

*AFFIRMED*

---

[7]On this record, Mohammad Khan, who was certainly another coconspirator, "is currently serving an 8-year prison term in the United Kingdom," and the United States "is interested in prosecuting [him] should he be extradited." J.A. 1010.