**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 18-4223**

UNITED STATES OF AMERICA,

Plaintiff − Appellee,

v.

MOHAMED ELSHINAWY, a/k/a Mojoe, a/k/a Mo Jo,

Defendant – Appellant.

Appeal from the United States District Court for the District of Maryland, at Baltimore. Ellen L. Hollander, District Judge. (1:16-cr-00009-ELH-1)

Submitted: May 1, 2019                                                Decided: July 16, 2019

Before WYNN, DIAZ, and THACKER, Circuit Judges.

Affirmed by unpublished opinion. Judge Diaz wrote the opinion in which Judge Wynn and Judge Thacker joined.

Gary E. Proctor, LAW OFFICES OF GARY E. PROCTOR, LLC, Baltimore, Maryland, for Appellant. Robert K. Hur, United States Attorney, Christine Manuelian, Assistant United States Attorney, Kenneth S. Clark, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

DIAZ, Circuit Judge:

Under the federal Sentencing Guidelines, a defendant faces sharply increased sentences if convicted of "a felony that involved, or was intended to promote, a federal crime of terrorism." *See* U.S.S.G. § 3A1.4. In this case, we consider whether the appellant, Mohamed Elshinawy, committed a "federal crime of terrorism" by—among other things— pledging allegiance to the Islamic State of Iraq and Syria ("ISIS") and accepting money from that group to put toward a terrorist attack in the United States. The district court held that he did. For reasons that follow, we affirm.

## I.

### A.

Elshinawy, a U.S. citizen, spent his childhood and student years in Egypt and Saudi Arabia before settling in Maryland in 2012. In 2014, he began communicating over social media with his childhood friend, Tamer Elkhodary, a self-described member of ISIS living in ISIS-controlled territory.

Elshinawy chatted with Elkhodary over several months, repeatedly expressing support for an Islamic caliphate, his belief in the legitimacy of ISIS, and his hope that ISIS would defeat its enemies. For instance, in late September 2014, Elshinawy asked Elkhodary if ISIS were "mujahidin,"[1] and said he couldn't "accept what the infidels do to

---

[1] "Mujahidin" are "[g]uerilla fighters in Islamic countries, especially those who are fighting against non-Muslim forces." Oxford Dictionaries, https://bit.ly/2EYy2zV (last visited June 20, 2019).

Muslims." J.A. 337. A few days later, Elshinawy sent his friend a video describing the coming of the "Islamic Caliphate" and "the end of Israel." *Id.* And over the following days, he told Elkhodary that he "live[d] with the Islamic State as if [he] were over there" and thought about ISIS "day and night." J.A. 337–38.

During these conversations, Elshinawy said he wanted to join ISIS in the Middle East. In October 2014, he told Elkhodary he would come to Syria with his wife (who had converted to Islam when she married Elshinawy) and aspired to be "one of the most fierce mujahidin." J.A. 338. Elkhodary advised Elshinawy about reaching Syria and offered to secure money for his travel.

In February 2015, Elshinawy pledged his allegiance to ISIS. He told Elkhodary that his "soul [was] there with the mujahidin" and described himself as "a soldier of the State, but temporarily away." J.A. 339. He asked Elkhodary to personally communicate his allegiance to ISIS's purported leader, Abu Bakr al-Baghdadi, and Elkhodary confirmed that he had done so. When Elkhodary advised him not to share his plans with anyone, Elshinawy responded: "Of course not. It is a crime here. A very big one." *Id.*

From there, Elshinawy's involvement with ISIS deepened. Starting in March 2015, Elshinawy received several cash transfers from ISIS affiliates. The money, about $8,700 in total, came mostly from a British company owned by an ISIS fighter.[2] Though much of the money is unaccounted for, Elshinawy used some of it to buy communications

---

[2] This company and its personnel are separately believed to have procured weaponized drone technology for ISIS.

3

equipment, including a laptop, an internet hotspot, a virtual private network, and multiple cellphones registered under different aliases. He then used these devices to communicate with his ISIS contacts.

Elshinawy continued to chat online with Elkhodary while receiving these funds, and their conversations soon began alluding to a project Elshinawy was planning. In early April 2015, he told Elkhodary that the latter would "[s]oon . . . hear good news, Allah willing," explaining that he "ha[d] many goals" but was "going slow for safety." J.A. 340. Elkhodary responded that Elshinawy had "always been a 'gangsta,'" to which Elshinawy replied: "Exactly . . . I'll come over when I am done, Allah willing." *Id.*

Later that month, Elshinawy told Elkhodary that he had found his "dream project" and that the two would meet after he finished his "work" in the United States. J.A. 341. The next day, he asked Elkhodary about "making a small thing with a silencer," saying he "hope[d] to find one" but would "make one" if necessary. J.A. 341–42. In that same chat, Elshinawy told Elkhodary to listen to ISIS's official spokesman, Abu Mohammad al-Adnani, whose speeches had urged western followers to launch attacks in their home countries in response to western bombings of ISIS sites.

During this same period, Elshinawy tried to recruit his brother Ahmed (who lives in Saudi Arabia) to join ISIS. Elshinawy told Ahmed that he had pledged allegiance to ISIS, received money from the group, and intended to undertake a project for them in the United States before moving to ISIS-controlled territories. He also engaged in several lengthy online discussions attempting to overcome Ahmed's opposition to ISIS. For instance, when Ahmed opined in a March 2015 conversation that killing violated the teachings of

4

the prophet Muhammad, Elshinawy responded that it was acceptable as "revenge for the Muslims" who "were tortured and killed by the most terrible means and weapons." J.A. 344. And in a June 2015 discussion, Elshinawy told Ahmed that "Muslims are in a state of war" with their enemies, and that "[k]illing the apostates is allowed." J.A. 352. Elshinawy also recommended Adnani's teachings to his brother, sending him a YouTube link to a speech. (Ultimately, however, Elshinawy failed to recruit Ahmed to his cause.)

The FBI began surveilling Elshinawy in June 2015, around the time that he received his last tranche of ISIS money. In mid-July 2015, agents approached him about the funds. During the course of four meetings, Elshinawy admitted that the money was to be used to conduct a terrorist attack in the United States. He explained that ISIS wanted to attack the United States because, if successful, they would show themselves to be a comparable power. And he told agents that his ISIS contact had instructed him to do something "destructive" that "hurts people," as long as it was in the United States. J.A. 1209. Following his meetings with the FBI, Elshinawy ceased communicating with Elkhodary, though the latter still tried to contact him.

The government thereafter obtained data from Elshinawy's phones and broadband accounts through subpoenas and online surveillance. Elshinawy also consented to a search of his laptop. Information obtained from these sources showed that Elshinawy regularly consumed online ISIS propaganda, including videos, blogs, photographs, and other ISIS-related materials. For instance, data from Elshinawy's laptop revealed that Elshinawy accessed an ISIS video showing the remains of Peter Kassig, an American aid worker

5

murdered by ISIS in November 2014. Records also showed that two days after meeting with the FBI in July 2015, Elshinawy streamed a beheading video.

In December 2015, the government arrested Elshinawy and searched his home. Agents found a large box containing dozens of newspapers dated November and December, most of which were opened to articles about ISIS, terrorist attacks, and similar subjects.

B.

Elshinawy was indicted in Maryland federal court on four charges: conspiring to provide material support to a foreign terrorist organization, *see* 18 U.S.C. § 2339B(a)(1); providing and attempting to provide material support, *see id.*; terrorism financing, *see id.* § 2339C(a)(1); and lying to FBI agents, *see id.* § 1001(a)(2).

Following plea discussions, Elshinawy and his attorneys held a proffer session with federal agents in August 2017. During that meeting, Elshinawy provided clearer details about a planned terrorist attack. He told the government that an ISIS contact had sent him potential targets and that he had "agreed to make a bomb that he would place somewhere where it would kill a lot of people." J.A. 510. In a written proffer agreement, the government promised not to introduce information from this meeting unless Elshinawy withheld information or submitted evidence or arguments "materially different from any proffer information." J.A. 1431.

Shortly after the proffer, Elshinawy agreed to plead guilty to all four counts. In a stipulated statement of facts, Elshinawy admitted providing material support to ISIS knowing that it was a foreign terrorist organization. That support, he said, consisted of

6

"personnel (including Elshinawy), services (including means and methods of communication), and financial services." J.A. 109. Elshinawy admitted many of the facts recounted above, including that he pledged himself to ISIS, tried to recruit his brother, and sought guidance from Elkhodary on "how to obtain or make some sort of explosive device and a silencer." *Id.* He also admitted that he received money "to be used to conduct a terrorist attack in the United States." J.A. 110. And he admitted lying to the FBI about the nature and extent of his ties with ISIS.

Despite admitting these terrorism-related crimes, however, Elshinawy argued that he was not subject to a sentencing enhancement for terrorism offenses. The district court held four hearings about this enhancement. During these proceedings, Elshinawy's expert in terrorism and counterterrorism, Marc Sageman, testified that the evidence was "overwhelming" that Elshinawy "tried to conduct an attack in the United States, or at least desired to conduct such an attack, for about two-and-a-half months" in early to mid-2015, but had abandoned such plans by summer 2015. J.A. 616–17. Sageman said Elshinawy's contemplated attack never had a specific target, though several were discussed; for instance, an attack that took place in Garland, Texas, in May 2015 was "given to [Elshinawy] as a potential model." J.A. 617–18.

In March 2018, the district court issued a 75-page memorandum opinion holding that Elshinawy was eligible for the terrorism enhancement. *See United States v. Elshinawy*, No. ELH-16-009, 2018 WL 1521876 (D. Md. Mar. 28, 2018). After a thorough examination of relevant law and a detailed account of the facts, the court held that

7

Elshinawy's material support offenses involved "federal crime[s] of terrorism" under the Guidelines, thereby qualifying him for the enhancement. *Id.* at *23.

The court also held that Elshinawy twice breached his proffer agreement by characterizing his directions from ISIS and his contemplated attack in terms that contradicted what he had told federal authorities during his August 2017 proffer session. *Id.* at *32–35. Because of this breach, the government could have used certain evidence from Elshinawy's proffer against him at sentencing. But the district court emphasized that its ruling on the terrorism enhancement didn't "rely[] on any information provided by the defendant during" the proffer session. *Id.* at *1; *see also id.* at *3 ("Without regard to use of the proffer material . . . I conclude that the evidence readily demonstrates that the terrorism enhancement applies here.").

Applying the enhancement, the court held that Elshinawy's advisory Guidelines sentencing range was 30 to 68 years. *Id.* at *39. The court later sentenced Elshinawy to 20 years in prison, finding that the advisory Guidelines range was "disproportionate under all the circumstances here." J.A. 1388.

II.

On appeal, Elshinawy contends that he is ineligible for the terrorism sentencing enhancement and didn't breach his proffer agreement. We initially scheduled oral argument, but, after that argument was continued, informed the parties that we would decide this case on the papers. Having reviewed the parties' briefs, the record, and the district court's exhaustive memorandum opinion, we find no reversible error.

8

## A.

We first consider whether the district court wrongly calculated Elshinawy's advisory Guidelines range by finding him eligible for the terrorism sentencing enhancement. In reviewing a district court's Guidelines calculation, "we review its legal conclusions de novo and its factual findings for clear error." *United States v. Hassan*, 742 F.3d 104, 148 (4th Cir. 2012) (internal quotations marks omitted).

The terrorism enhancement provides that if a defendant's offense "involved, or was intended to promote, a federal crime of terrorism," he receives a 12-level increase in his offense level and a criminal history score of VI (the maximum score). U.S.S.G. § 3A1.4(a)–(b). The effect of this enhancement on a defendant's Guidelines range can be dramatic. Here for instance, Elshinawy's recommended sentence without the enhancement would have been, at most, six-and-a-half years. With it, his recommended sentence was 30 years at the minimum.

To decide whether an offense involved a federal crime of terrorism, we use the definition of that phrase in 18 U.S.C. § 2332b(g)(5). U.S.S.G. § 3A1.4 cmt. 1; *Hassan*, 742 F.3d at 148. According to this definition, a "federal crime of terrorism" has two components. First, it must be a violation of one of several enumerated statutes. 18 U.S.C. § 2332b(g)(5)(B). Second, it must be "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."

18 U.S.C. § 2332b(g)(5)(A). This second element is often called the terrorism enhancement's "specific intent requirement." *E.g.*, *Hassan*, 742 F.3d at 148.[3]

Elshinawy accepts that the first requirement is met. Three of his offenses—conspiracy to materially support a terrorist organization, material support, and terrorism financing—are enumerated terrorism crimes. *See* 18 U.S.C. § 2332b(g)(5)(B)(i). He claims, though, that the government failed to prove the specific intent prong of the Guidelines' definition because his offenses, he says, weren't calculated to influence, affect, or retaliate against government conduct.

We disagree. Our published cases hold that the government may prove the requisite intent with evidence that a defendant gave material aid to a foreign terrorist group knowing and supporting that group's goals of coercing or avenging government conduct. *See United States v. Chandia* (*Chandia III*), 675 F.3d 329, 340–41 (4th Cir. 2012); *United States v. Hammoud*, 381 F.3d 316, 356 (4th Cir. 2004) (en banc), *vacated on other grounds*, 543 U.S. 1097 (2005). Such evidence suggests that the defendant's material support was "intended to advance" the terrorists' goals. *Chandia III*, 675 F.3d at 340.

For instance, in *Chandia*, we ultimately upheld application of the terrorism enhancement when the defendant chauffeured and provided administrative support to the

---

[3] A district court deciding whether to impose the terrorism enhancement must "resolve any factual disputes" relevant to the enhancement and then, if it finds the requisite intent, should "identify the evidence in the record that supports" that finding. *Hassan*, 742 F.3d at 148 (quoting *United States v. Chandia* (*Chandia I*), 514 F.3d 365, 376 (4th Cir. 2008)). Elshinawy concedes—as he must—that the district court sufficiently explained its decision to apply the terrorism enhancement.

leader of a Pakistani terror group, knowing that the group engaged in violent acts against the Indian government, that his passenger was the group's leader, and that the leader was in the United States on terrorist business. *Chandia III*, 675 F.3d at 340–41. And before that, in *Hammoud*, we applied the enhancement to a man who had donated money to Hezbollah, when the evidence showed his close connection with Hezbollah officials and his awareness and personal support for its terrorist activities and goals. 381 F.3d at 356. Other courts have likewise found the requisite intent based on evidence that a defendant materially supported a terrorist group while favoring that group's goals of coercing or retaliating against government conduct. *See United States v. Van Haften*, 881 F.3d 543, 545 (7th Cir. 2018); *United States v. Ali*, 799 F.3d 1008, 1031–32 (8th Cir. 2015); *United States v. El-Mezain*, 664 F.3d 467, 571 (5th Cir. 2011); *United States v. Jayyousi*, 657 F.3d 1085, 1115 (11th Cir. 2011).

Given this authority, the district court properly found that Elshinawy possessed the necessary intent. First, Elshinawy evidently knew ISIS's purpose was to coerce and retaliate against government conduct. He admitted in his guilty plea that ISIS was a foreign terrorist organization; his apartment contained a large box of articles about ISIS and attacks it had directed or inspired, including those in Paris and San Bernardino, California; he had consumed ISIS propaganda online, including a video of a beheaded American hostage and speeches urging violent retaliation for western bombings in the Middle East; and he explained to the FBI that ISIS's strategy is to "be destructive everywhere" and to show it is "comparable [sic] of being a big power" by "hurt[ing] the United States." J.A. 1102, 1209.

11

Second—and more importantly—Elshinawy wholeheartedly supported these goals in both word and deed. As the district court recognized: "Elshinawy did not regard himself as a mere observer to the activities of ISIS." *Elshinawy*, 2018 WL 1521876, at \*24. On the contrary, he pledged allegiance to ISIS and its leader; he wished for its victories and considered himself a "soldier" in its cause; and he praised Adnani's violent anti-western messages, recommending his speeches to both Elkhodary and Ahmed. Elshinawy also repeatedly expressed support for retaliating against ISIS's adversaries, including the United States, for their alleged mistreatment of Muslims. *See, e.g.*, J.A. 337 ("[W]e have been living for a while under rulers and scholars who facilitated for the rulers their injustice and humiliation of Muslims."). Elshinawy's communications show he "was well aware of [ISIS's] terrorist activities and goals" and "personally supported that aspect of [ISIS]." *Hammoud*, 381 F.3d at 356.

Plus, Elshinawy evinced support for ISIS's terrorist goals through his actions. He admitted receiving money from ISIS to use for a terrorist attack; he spoke to both Ahmed and Elkhodary about undertaking a "project" on ISIS's behalf; and he sought guidance from Elkhodary about how to obtain or make an explosive device and a silencer. Indeed, Elshinawy's own expert testified that, for over two months, Elshinawy was "very dedicated to carrying out an attack" in the United States. J.A. 630. This evidence supports the district court's finding that Elshinawy "intended to carry out a terrorist attack in the United States" in ISIS's name, *Elshinawy*, 2018 WL 1521876, at \*23, which alone probably suffices to establish the necessary intent.

12

Elshinawy argues, however, that the terrorism enhancement doesn't apply to him because the record shows only his "generalized commitment to conduct an unspecified attack," and no "actual plan" to affect or retaliate against government conduct. Appellant's Br. at 17. That's beside the point. Elshinawy has admitted providing material support to ISIS by pledging his services, buying equipment, and accepting cash. The terrorism enhancement hinges on what *those acts* were calculated to accomplish—not some other acts he may or may not have been planning. And, as the district court found, the evidence strongly indicates that the purpose of Elshinawy's material support was to advance ISIS's goals of avenging perceived mistreatment of Muslims by the United States and its allies.

Elshinawy was therefore eligible for the terrorism sentencing enhancement.

## B.

Elshinawy also challenges the district court's finding that he breached his proffer agreement.[4] We need not decide this issue. Assuming for argument's sake that the district court wrongly found a breach, we are satisfied such error didn't affect Elshinawy's sentence, and was therefore harmless. *See* Fed. R. Crim. P. 52(a); *United States v. McDonald*, 850 F.3d 640, 643 (4th Cir. 2017) ("[W]e must disregard harmless errors.").

Recall that the proffer agreement prevented the government from using anything from the proffer session against Elshinawy unless he submitted evidence or arguments "materially different from any proffer information." J.A. 1431. The district court found

---

[4] Elshinawy hasn't waived review of this finding. His plea agreement broadly reserved the right to appeal "*any issues* that relate to" the district court's sentencing decisions. J.A. 106 (emphasis added).

13

that Elshinawy breached this pact in two ways. The first breach concerned Elshinawy's statement in a sentencing memorandum that he "was provided little to no specific direction by his ISIS contacts regarding the type of attack to launch." J.A. 137. The court found this statement materially different from what Elshinawy had told federal agents during the proffer session—namely, that an ISIS contact had sent him three encrypted pictures of potential targets; that a Texas businessman was "to be the target of an ISIS assassination for which [he] would be the intended killer"; and that his ISIS contact had sent him encrypted guidance for the assassination as well as advice on how to avoid detection. *Elshinawy*, 2018 WL 1521876, at *33. The second breach concerned Elshinawy's claim in the same filing that "[n]o concrete evidence exists to determine the nature of the attack that Mr. Elshinawy was contemplating." J.A. 139. This claim, the court said, "completely contradicted" Elshinawy's admission to investigators that he agreed to make a bomb and place it "somewhere where it would kill a lot of people." *Elshinawy*, 2018 WL 1521876, at *35.

Elshinawy argues that he did not breach the proffer agreement because his contested statements didn't assert new facts, but merely challenged the sufficiency of the government's evidence regarding his intent. *See United States v. Rosemond*, 841 F.3d 95, 108–10 (2d Cir. 2016) (defense counsel may draw attention to the lack of evidence presented despite proffer agreement). But even if he's right, we hardly see how the district court's contrary finding harmed him. Notably, Elshinawy doesn't dispute the court's repeated assertion that it ignored proffer information when applying the terrorism enhancement.

14

Instead, Elshinawy claims proffer material affected the district court's sentencing decision because the court observed, before handing down his sentence, that he "could have" carried out a terrorist attack and "was instructed to do so." J.A. 1379. In Elshinawy's view, these observations necessarily relied on information from the proffer session. But he's incorrect. Elshinawy told FBI agents during his July 2015 meetings that he had been instructed to conduct an attack. And his own expert testified at sentencing that he could have done so. *See* J.A. 632–33 (Elshinawy saw himself as "a solider for the Islamic State" and thus "was very dangerous"). The district court's offending remarks, therefore, didn't reference proffer material.

Elshinawy hasn't pointed to anything else in the record that suggests his sentence was in any way affected by the proffer information. Because we can therefore "say with fair assurance" that "the judgment was not substantially swayed" by the district court's breach ruling, we need not decide whether it was correct. *United States v. McLean*, 715 F.3d 129, 143 (4th Cir. 2013) (internal quotation marks omitted).

## III.

For the above reasons, we affirm the judgment of the district court. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before this court and argument would not aid the decisional process.[5]

---

[5] On June 12, 2019, Elshinawy sought leave to file a supplemental pro se brief asserting arguments not raised in his opening or reply briefs. We need not consider pro se briefs filed by appellants represented by counsel. *E.g.*, *United States v. Cohen*, 888 F.3d (Continued)

15

667, 682 (4th Cir. 2018).  Nevertheless, in this instance, we exercise our discretion to consider Elshinawy's additional arguments, which we find to be without merit.