**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 19-1613

FOODBUY, LLC,

Plaintiff – Appellant,

v.

GREGORY PACKAGING, INC.,

Defendant – Appellee.

No. 19-1692

FOODBUY, LLC,

Plaintiff – Appellee,

v.

GREGORY PACKAGING, INC.,

Defendant – Appellant.

Appeals from the United States District Court for the Western District of North Carolina, at Charlotte.  Frank D. Whitney, District Judge.  (3:16-cv-00809-FDW-DCK)

Argued:  September 8, 2020                     Decided:  February 1, 2021

Before NIEMEYER and AGEE, Circuit Judges, and Thomas S. KLEEH, United States District Judge for the Northern District of West Virginia, sitting by designation.[*]

---

Affirmed in part, vacated in part, and remanded by published opinion. Judge Agee wrote the opinion, in which Judge Niemeyer and Judge Kleeh joined.

---

**ARGUED:** William Clifford Wood, Jr., NELSON MULLINS RILEY & SCARBOROUGH, LLP, Columbia, South Carolina, for Appellant/Cross-Appellee. Thomas Russell Ferguson, WOMBLE BOND DICKINSON (US) LLP, Charlotte, North Carolina, for Appellee/Cross-Appellant. **ON BRIEF:** Fred M. Wood, Jr., Ariel E. Harris, Evan M. Sauda, NELSON MULLINS RILEY & SCARBOROUGH, LLP, Charlotte, North Carolina, for Appellant/Cross-Appellee. Kurt E. Lindquist II, Emily C. Doll, Charlotte, North Carolina, Samuel B. Hartzell, WOMBLE BOND DICKINSON (US) LLP, Raleigh, North Carolina, for Appellee/Cross-Appellant.

---

[*] After argument, Judge Quattlebaum recused himself, and Judge Niemeyer elected to participate on the earlier recorded oral argument, briefs, appendices, and district court record.

2

AGEE, Circuit Judge:

Foodbuy, LLC ("Foodbuy") and Gregory Packaging, Inc. ("GPI") cross-appeal from the district court's judgment after a bench trial. For the reasons discussed below, we affirm the district court's judgment in part, vacate it in part, and remand it for further proceedings.

## I.

GPI manufactures juice cups, which it supplies to institutions like schools and hospitals. Foodbuy is a Group Purchasing Organization ("GPO"), which pools institutional purchasers so that their aggregated buying power can be used as leverage to negotiate favorable pricing with manufacturers. From 2011 through 2015, GPI and Foodbuy were engaged in a non-exclusive commercial relationship, which was memorialized in a supplier agreement (the "Agreement"). That Agreement lies at the heart of this dispute. Before turning to its scope and application, however, we first provide a rudimentary overview of the juice business as it relates to this case.

## A.

GPI—like most juice cup manufacturers—sells its products in one of three ways. The first is a straightforward "traditional sale" in which the manufacturer sells juice to a distributor who, in turn, resells that juice to a customer at whatever price the market will bear.

The second sales method is known as a "direct deal." For institutional customers that purchase large volumes of juice, the manufacturer negotiates directly with that

customer for special pricing. This type of sale typically occurs where manufacturers submit bids to a potential customer (for example, a school system), which accepts one of those bids for its juice supply for the year. These types of sales are often referred to as "school bids." In a direct deal, the customer still orders and receives the juice from a distributor, but the distributor does not set the price. Instead, the customer pays the distributor the direct-deal price it negotiated with the manufacturer, which is usually less than the amount the distributor paid for the product. To account for this difference, the distributor "deviates" to that price and then recovers the difference from the manufacturer the next time it buys juice.

The third way GPI (and similar manufacturers) sells its products—which is the most relevant here—is known as a "GPO sale." As with a direct deal, the customer pays the distributor directly, but does so at the GPO-negotiated price rather than a price negotiated directly with the manufacturer. When supplying the customer, the distributor deviates to that price. The GPO then invoices GPI for a "volume allowance" rebate for each case of juice sold. The GPO passes along some—but not all—of that allowance to the customer. As a result, the customer's net price is the GPO-negotiated price minus the portion of the volume allowance that GPO passes along to it.

Because all three scenarios involve an intermediary distributor, the pricing system is fairly complex. While different customers buy the same products at different prices, distributors place only one order with a manufacturer for their supply. Typically, manufacturers sell all of their products to a distributor at one up-front price, known as the

4

"landed cost." The distributor may then sell those products to traditional sale customers at one price, direct-deal customers at another, and GPO customers at yet another.

B.

Consistent with this industry practice, Foodbuy and GPI negotiated the Agreement in 2011.[1] Under its terms, GPI agreed to pay Foodbuy a volume allowance based on the quantity of its products purchased "through the Foodbuy program at the Foodbuy price" by Committed Customers[2] through Foodbuy Distributors.[3] GPI also contracted to pay Foodbuy various "growth incentives" based on incremental increases in GPI's products purchased by Committed Customers through Foodbuy Distributors. Under the Agreement, Foodbuy invoiced GPI for the allowance due each month based on data it received from Foodbuy Distributors.[4]

---

[1] The Agreement was based on a Foodbuy template. Despite GPI's concerns prior to the parties signing the Agreement, Foodbuy's counsel did not permit any changes to its legal terms.

[2] The Agreement defined "Committed Customer" as "a client of Foodbuy that has agreed in writing to authorize Foodbuy to negotiate the commercial terms of purchasing contracts on its behalf or has outsourced all or a portion of its purchasing functions to Foodbuy by written agreement." J.A. 1559. Significantly, Committed Customers were allowed to buy "off-contract," outside of Foodbuy's program. Thus, Foodbuy customers could buy at other pricing when a better option was available to them, when they had a direct deal, or when a certain distributor was out of stock for a product and they had to go to another distributor. Indeed, on occasion, distributors would offer better pricing than the Foodbuy price.

[3] The Agreement defined "Foodbuy Distributors" as "Foodbuy's designated distributors purchasing Products from [GPI] on behalf of the Committed Customers." J.A. 1559.

[4] Whenever a Committed Customer purchased juice—whether at the Foodbuy-negotiated price or otherwise—Foodbuy received data about that customer's purchase directly from Foodbuy Distributors, which had separate contracts to provide Foodbuy "line-item detail regarding every data point available." J.A. 1488.

5

Unsurprisingly, the Agreement was extensive. Rather than delineating its terms in their entirety, we will highlight the provisions most relevant to our analysis of the issues presented. Section 2 of the Agreement sought to establish its scope and application:

> This Agreement contains the terms and conditions for the sale of products specified on Attachment "A" attached hereto (the "Products"), at the prices specified on Attachment "A" (the "Prices"), by [GPI] to Foodbuy Distributors . . . purchasing on behalf of Committed Customers. The Parties agree that this is a non-exclusive relationship, and there are no quantities committed by Foodbuy, the Committed Customers or the Foodbuy Distributors in either dollar value or Product items.

J.A. 1559. To that end, Attachment A included a "market list price," which was the price Foodbuy sent to distributors so they knew the cost of a case of juice sold under the Foodbuy program. In other words, that price was the amount to which the distributor would deviate when the product was sold to a Foodbuy customer purchasing at the negotiated price. Foodbuy incorporated a right to audit GPI's records in Section 15 of the Agreement to verify GPI was honoring the pricelist set forth in Attachment A.

Section 6 of the Agreement provided that GPI would "pay to Foodbuy allowances calculated and payable in accordance with the terms of Attachment 'D'" and that "[a]ll allowances are calculated based on Foodbuy Distributor reporting and tracking of such Foodbuy Distributor dollar volume with [GPI] on behalf of Committed Customers[.]" J.A. 1559. Attachment D defined "allowance" as a monthly "amount equal to the number of cases ordered by Foodbuy Distributors on behalf of Committed Customers multiplied by the 'Allowance per Case' amounts listed on Attachment 'A.'" J.A. 1572.

The Agreement also contained a non-solicitation provision in Section 18, which provided:

6

During the term of this Agreement, absent prior written consent from Foodbuy, [GPI] will refrain from (i) soliciting any Foodbuy Committed Customer to procure products from [GPI] outside of the Committed Customer's relationship with Foodbuy, or (ii) otherwise arranging any procurement relationship, directly, with any Committed Customer, wherein [GPI] procures products for such Committed Customer.

J.A. 1561–62. At trial, one of Foodbuy's witnesses testified that it included the solicitation ban because it did not want GPI "going directly to the Committed Customer without Foodbuy's written consent and engaging them directly and excluding Foodbuy from the commercial relationship." J.A. 821.

Finally, the Parties included a merger clause in Section 19 of the Agreement, which stated:

This Agreement and the Attachments attached hereto constitute the entire agreement and understanding between the Parties relating to the subject matter hereof, and supersede all other agreements between the Parties with respect thereto . . . . Unless otherwise agreed to by both Parties in writing, this Agreement shall apply to all invoices, purchase orders and other documents of purchase which Foodbuy or a Foodbuy Distributor purchasing on behalf of a Committed Customer may place with [GPI], or which [GPI] may generate as a result of the Product request, for the Products or other items purchased from [GPI] on behalf of Committed Customers (each an "Order"). The terms and conditions of this Agreement shall apply to any Order whether or not this Agreement or its terms and conditions are expressly referenced in the Order. This Agreement shall apply to any purchase and sale transaction between [GPI] and Foodbuy, a Committed Customer or a Foodbuy Distributor purchasing on behalf of Foodbuy or a Committed Customer.

J.A. 1562.[5]

---

[5] The Parties stipulated at trial that the Agreement was a valid and binding contract that governed the relationship between them.

C.

GPI initially viewed its relationship with Foodbuy as "successful," J.A. 1185, and sought to continue it. As a result, the Parties amended the Agreement in 2013 (the "Amendment") to extend it until June 30, 2015. The Amendment included many of the original terms from the Agreement, including the same price-per-case and volume allowance. The Amendment also incorporated a "net price per case" valuation, calculated by subtracting the volume allowance from the product base. J.A. 1510.

GPI continued to monitor and review Foodbuy's monthly invoices and regularly submitted minor adjustments for things like the amount of allowance due and whether a distributor or customer was a Foodbuy Distributor or a Committed Customer under the Agreement. As the district court found, whenever GPI learned

> about cases of juice sold through other programs that were either: (i) not a listed product; (ii) not sold by a listed Foodbuy Distributor; (iii) not sold to a listed Committed Customer; or (iv) were sold through a different program, i.e. at a different price—Foodbuy would accept a deduction or issue a credit each and every time.

*Foodbuy, LLC v. Gregory Packaging, Inc.*, No. 3:16-cv-00809-FDW-DCK, 2018 WL 4603159, at \*13 (W.D.N.C. Sept. 25, 2018). And

> [w]hen [GPI] was invoiced for customers that [were getting the benefit of two purchasing programs], Foodbuy agreed [GPI] should not be invoiced for that customer and assured [GPI] that Foodbuy would "scrub" its data going back years to ascertain and correct instances of [GPI] being invoiced by Foodbuy when a Committed Customer was receiving the benefit of another program.

*Id.* at \*14. That is because, "if a volume allowance [was] paid on a case sold at school bid pricing, [GPI] would lose money on that sale." *Id.* at \*11.

8

In April 2014, Foodbuy added a new Committed Customer, IPS, which was a preexisting direct-deal customer of GPI. Soon thereafter, upon reviewing one of its monthly invoices, GPI contacted Foodbuy noting that 88,000 cases (92%) of the cases sold to IPS were "school bid" volume that should have been excluded from the Agreement. In response, Foodbuy agreed not to invoice for IPS's purchases in their entirety "because it was too difficult to isolate the 8% of cases that were purchased through Foodbuy." *Id.* at *14.[6]

D.

Unfortunately, the Parties' relationship soured in early 2015. Despite the representations and concessions outlined above, GPI discovered that throughout the duration of the Agreement, Foodbuy had been charging it a volume allowance for every case of juice its Committed Customers purchased, not just for those cases bought through the Foodbuy program. GPI was previously unaware of this data because Foodbuy's monthly invoices did not disclose which customer purchased the juice or the applicable purchase price. Indeed, GPI did not become suspicious of Foodbuy's invoices until it found that more cases were accounted for by deviations than were actually shipped into certain distribution centers.

At that point, GPI tried to obtain the relevant data directly from distributors. Once Foodbuy learned about the dispute, however, it prevented GPI from doing so. In response,

---

[6] The district court determined that, throughout the course of the Parties' relationship, Foodbuy excluded other school bids from the Agreement as well.

GPI asked Foodbuy for detailed data regarding its invoices, but it did not receive a detailed response until after the Agreement expired.[7] Once GPI eventually saw this pricing data, it discovered cases of GPI's juice for which Foodbuy claimed a volume allowance, but for which the ultimate price paid (i.e., the price to which the distributor deviated) was higher or lower than the Foodbuy contract price, indicating that it was purchased through another program. In total, GPI learned that it was charged a volume allowance for 4,489,367 cases it believes were purchased "off-contract," resulting in a claimed overpayment by GPI of $6,042,431.[8]

GPI unilaterally stopped paying Foodbuy's volume allowance beginning in March 2015. Eventually, GPI promised to honor the terms of the Agreement and made allowance payments for March through June 2015, but it refused Foodbuy's demands that it do so for July and August 2015 (after the Amendment's expiration date). In accordance with the terms of the Agreement, the Parties engaged in mediation, which failed. Foodbuy then filed a Complaint against GPI alleging, among other claims, breach of contract for overcharging its Committed Customers. GPI counterclaimed, asserting, in relevant part, breach of

---

[7] Internally, Foodbuy acknowledged that it did "'not have a clear delineation on bid schools and'" it had "'not been able to manage that,' except for when 'suppliers raise up issues or deduct on member units per invoices,'" while at the same time noting that suppliers could "only do [that] 'if they receive[d] unit level detail,'" which GPI did not. *Id.* at *13.

[8] GPI also alleged Foodbuy counted these off-contract purchases in determining the total volume of sales to Committed Customers through Foodbuy Distributors under the Agreement. In other words, Foodbuy claimed it had hit various growth-incentive targets under the Agreement by counting cases not purchased through its program and in which it played no role in facilitating the sale. GPI maintains this artificial inflation resulted in it paying an additional $516,899.70 to Foodbuy in unearned payouts.

contract for over-invoicing and violations of North Carolina's Unfair and Deceptive Trade Practices Act ("UDTPA").

E.

GPI moved to dismiss Foodbuy's overcharging claim, arguing it lacked standing because the damages, if any, belonged to Foodbuy's Committed Customers. In other words, it argued Foodbuy could not show it was injured or entitled to relief. Relying on Foodbuy's allegation in its Complaint that it "discovered that *Committed Customers[] paid higher prices* for the Products than those permitted" by the Agreement, J.A. 20 ¶ 23 (emphasis added), the district court held that Foodbuy failed to show it was entitled to recover for any alleged overcharging. As a result, the court granted GPI's motion and dismissed Foodbuy's claim for lack of standing. In doing so, the district court also denied Foodbuy's request in its Response Brief that in the event the court found it lacked standing it be allowed to amend the Complaint to add its parent company—and largest Committed Customer—as an additional plaintiff.

F.

After filing its counterclaims, GPI submitted its initial disclosures to Foodbuy, which provided that it was unable to provide a full calculation of its damages at the time because it lacked sufficient information. Nevertheless, GPI estimated its actual damages to be approximately $6,000,000, not including treble damages for the UDTPA violations. It later provided written discovery responses to that effect.

Throughout discovery GPI continued to take the position that it lacked sufficient information to provide a full damages calculation. During fact depositions, for example,

11

GPI's witnesses repeatedly: (1) testified that they did not know how the damages were calculated; (2) testified that the number provided was just an estimate; or (3) placed the responsibility on someone else to analyze GPI's damages. GPI never designated an expert witness on the subject and did not supplement its initial disclosures or discovery responses.

Nor did GPI's Rule 30(b)(6) witness, Shawn Early, provide a calculation, despite damages being listed as a topic on which he was designated to testify. When asked about GPI's damages computation and methodology, Early responded that he "made an estimate, because we were unable to get all the documentation at the time to properly do an estimate for how much damages were." J.A. 348. However, GPI had received the full set of data from Foodbuy detailing distributor transactions two weeks before his testimony. Nonetheless, neither Early nor any other fact witness had updated GPI's damages assessment in light of these disclosures.

## G.

At the start of trial, Foodbuy moved in limine to exclude evidence of damages. The district court reserved ruling on the motion. On the second day of trial, Foodbuy moved to amend its Answer to assert a statute-of-limitations defense for the first time in an effort to preclude its exposure for damages GPI incurred during the early years of the Agreement. The court denied the motion, holding that Foodbuy had "forfeited" that defense by failing to include it in its Answer, J.A. 1419, and observing that there were no "exceptional circumstances" explaining why Foodbuy waited to raise it until trial, J.A. 1418.

12

On the third day, GPI called Early to testify.[9] When he took the stand, he testified about GPI's damages calculation with the aid of demonstrative exhibits that had not been previously disclosed. Over Foodbuy's objection, the district court allowed Early's testimony. After beginning its cross-examination, Foodbuy asked that it "be allowed to put our rebuttal expert in to testify about her calculation about these damages." J.A. 1190. The court granted that request and gave Foodbuy a week-long recess to review GPI's entire evidence on damages in an effort "to make sure that [Foodbuy] had adequate time to prepare to respond to Mr. Early." J.A. 1300. The court emphasized that it was "pushing the trial back . . . so the rebuttal expert has time to review all of those documents." J.A. 1204. "The idea is to allow the rebuttal witness," who was in the courtroom for Early's testimony, "to hear the testimony of defense witness and to do her analysis, give her adequate time to do her analysis since she would be able to testify" a week later. J.A. 1204. The court also granted the request for a recess because Foodbuy was not prepared to fully cross-examine Early immediately following his direct examination given the new information about damages he had presented. J.A. 1207. In response, Foodbuy's counsel acknowledged that the court's approach "sound[ed] fair and reasonable." J.A. 1211–12. And when the parties returned from the recess, Foodbuy neither requested more time nor asserted prejudice by proceeding at that time. *See* J.A. 1308–11.

---

[9] GPI's pretrial filings listed Early as a witness and included a boilerplate description of his testimony, which did not include any reference to the damages calculation or methodology.

13

H.

After the bench trial, the district court entered an extensive judgment order and opinion detailing its findings of fact and conclusions of law.[10] For GPI's breach of contract claim, the court entered two alternative holdings. Initially, it determined that the Agreement was unambiguous and, under its plain language, required GPI to pay a volume allowance only for purchases made through Foodbuy's program (and thus at Foodbuy's price).

Alternatively, the court found that even if the Agreement was ambiguous, rules of contractual interpretation led to the same result. First, the court relied on the general principle that "[c]ontract terms must be construed to give meaning and effect to every part of the contract, rather than leave a portion of the contract meaningless or reduced to mere surplusage." *Goodman v. Resol. Tr. Corp.*, 7 F.3d 1123, 1127 (4th Cir. 1993). Applying that rule, the court determined that were it to adopt Foodbuy's interpretation that it was entitled to a volume allowance on every case sold by GPI, regardless of whether it was sold

---

[10] We review "a judgment following a bench trial under a mixed standard of review." *Butts v. United States*, 930 F.3d 234, 238 (4th Cir. 2019), *cert. denied*, 140 S. Ct. 1113 (2020). Though we review conclusions of law de novo, "we may reverse factual findings only if they are clearly erroneous." *Id.* A factual finding is clearly erroneous if we are "'left with the definite and firm conviction that a mistake has been committed.'" *United States v. Chandia*, 675 F.3d 329, 337 (4th Cir. 2012). To that end, we will not "substitute our version of the facts for that found by the district court." *Equinor USA Onshore Props. Inc. v. Pine Res., LLC*, 917 F.3d 807, 813 (4th Cir. 2019). So long as the "'court's account of the evidence is plausible in light of the record viewed in its entirety, [we] may not reverse it even though convinced that had [we] been sitting as the trier of fact, [we] would have weighed the evidence differently.'" *Butts*, 930 F.3d at 238; *accord Helton v. AT&T Inc.*, 709 F.3d 343, 350 (4th Cir. 2013) (holding that a district court's "factual findings [that] turn on . . . the weighing of conflicting evidence during a bench trial . . . are entitled to even greater deference").

to a customer buying through Foodbuy's program at Foodbuy's price, that would reduce all of the pricing references in the Agreement to surplusage. It would have the same effect on the non-solicitation provision, given that all of Foodbuy's witnesses made clear during trial that there was no reason for that language under its interpretation of the Agreement.[11]

Second, the court cited the North Carolina courts' rule of construction that "'when a contract is fairly susceptible of two constructions, one of which makes it fair and customary and which prudent persons would naturally enter into while the other makes it inequitable, the former interpretation must be preferred to the latter.'" *Mgmt. Sys. Assocs., Inc. v. McDonnell Douglas Corp.*, 762 F.2d 1161, 1172 (4th Cir. 1985) (alteration omitted); *Foodbuy, LLC*, 2018 WL 4603159, at \*22. In doing so, the court concluded that Foodbuy's interpretation made no economic sense, which it found to be a compelling reason for rejecting it. "[N]o reasonable supplier would enter into such an agreement" when it would

---

[11] For example, Foodbuy's chief negotiator for the Agreement testified:

Q: [I]f Foodbuy's interpretation of the contract is that you get volume allowance on all sales to committed customers by Gregory Packaging in this case, why do you care about a non-solicitation provision in your contract? It seems superfluous. Am I wrong?

A: I think that it has to do with the fact that to inhibit the supplier, in this case Gregory Sun Cup, to go outside of the contractual relationship with Foodbuy to try to engage a committed customer directly and get a different deal.

Q: As I understand the way you interpret the contract, that would still be a sale to a committed customer, even if it was through Gregory, and you get a volume allowance, right?

A: I – don't have a good answer for that.

J.A. 827. Foodbuy's lead negotiator for the Amendment likewise could not explain the need for the non-solicitation provision under Foodbuy's interpretation. *See* J.A. 864–65.

15

have "to pay a volume allowance on school bid cases" given the incredibly low margins on those types of deals. *Foodbuy, LLC*, 2018 WL 4603159, at \*22. "Thus, under Foodbuy's interpretation, [GPI] would *lose* money on school bid cases, which makes no economic sense because approximately 60% of [GPI's] business is through school bids." *Id.* This reality cautioned against adopting Foodbuy's interpretation of GPI's obligations under the Agreement.

Third, the district court found that the "usual and customary practice in the industry support[ed] [its] interpretation—both parties knew when they negotiated the Agreement that GPOs in the industry only collect a volume allowance on cases of juice sold through the GPO[']s program and at the GPO[']s price, which has a volume allowance built in." *Id.* at \*23 (citing *Bank of Am., N.C. v. Old Republic Ins. Co.* 4 F. Supp. 3d 790, 796 (W.D.N.C. 2014) ("A custom or usage may be proved in explanation and qualification of terms of a contract which otherwise would be ambiguous.")). "The evidence showed both Foodbuy and [GPI] approached the negotiation and decision to enter into the [Agreement] as actors intimately familiar with the usual and standard practices of the foodservice industry." *Id.* at \*22. And "the evidence show[ed] the custom and practice of the industry is that a volume allowance is not owed for cases of product sold outside of a GPO's (Foodbuy's) program. Indeed, that is why 'off-contract' is an industry term." *Id.* at \*23. Thus, Foodbuy's interpretation would have been a stark departure from industry norms.

Fourth, the district court determined its construction of the ambiguous terms of the Agreement was supported by the basic principle that "ambiguous provisions in contracts [are to be construed] against the drafters." *Bartels ex rel. Bartels v. Saber Healthcare Grp.,*

16

*LLC*, 880 F.3d 668, 685 (4th Cir. 2018) (Floyd, J., concurring in part and concurring in the judgment); *Foodbuy, LLC*, 2018 WL 4603159, at \*23. Indeed, the court recognized it had a "duty under North Carolina law to construe the ambiguous contract terms against the drafter." *Cosey v. Prudential Ins. Co. of Am.*, 735 F.3d 161, 170 (4th Cir. 2013); *Foodbuy, LLC*, 2018 WL 4603159, at \*23. Hence, because Foodbuy was the drafter of the Agreement, the court determined that any ambiguity should be construed against it. *Foodbuy, LLC*, 2018 WL 4603159, at \*23.

Fifth, the district court determined its construction of the Agreement was the correct one in light of the Parties' conduct "prior to the time this dispute arose and when both were acting under the Agreement as they interpreted it." *Foodbuy, LLC*, 2018 WL 4603159, at \*24 (citing *Bicket v. McLean Sec., Inc.*, 532 S.E.2d 183, 188 (N.C. Ct. App. 2000) (holding that under North Carolina law, courts "must give consideration to evidence of the parties' own interpretation of the contract prior to the controversy")). Citing a litany of occurrences throughout the course of Agreement, the district court determined that the Parties' conduct supported the conclusion that Foodbuy's interpretation was novel—developed for the purpose of litigation—and erroneous—inconsistent with their prior position. *Id.* at \*24–25. As a result, the court held that Foodbuy had breached the Agreement by charging GPI for *every* case of juice sold regardless of whether it was purchased through the Foodbuy program. *Id.*

Having found in favor of GPI on its breach of contract claim, the court then turned to its UDTPA claim. As an initial matter, the court determined that the economic loss rule ("ELR") barred its claim. *Id.* at \*27–28. The court also found that GPI failed to provide

17

any competent evidence at trial of any aggravating circumstances, as evinced by the court's dismissal of its fraud and fraud-by-concealment counterclaims. As a result, the court dismissed the claim. *Id.* at \*28–29.

The Parties filed timely notices of appeal. We have consolidated the cases and have jurisdiction under 28 U.S.C. § 1291.

## II.

The Parties present five issues for our review: (1) whether the district court erred in granting GPI's motion to dismiss Foodbuy's overcharging claim for lack of standing; (2) whether the district court abused its discretion in denying Foodbuy's motion in limine to exclude GPI's damages calculation; (3) whether the court abused its discretion in denying Foodbuy's request for leave to amend its answer to conform to the evidence; (4) whether the district court erred in its interpretation of the Agreement; and (5) whether the district court wrongly denied GPI's cross-claim alleging violations of the UDTPA. We address each in turn.

## A.

We first consider the district court's dismissal of Foodbuy's overcharging claim for lack of standing. We review questions of standing de novo. *See South Carolina v. United States*, 912 F.3d 720, 726 (4th Cir.), *cert. denied*, 140 S. Ct. 392 (2019). Under Article III's case-or-controversy requirement,

> a plaintiff must show (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the

18

defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). "Every federal appellate court has a special obligation to satisfy itself not only of its own jurisdiction, but also that of the lower courts in a case under review." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 95 (1998) (internal quotation marks omitted). To that end, "[i]t is well settled that under Article III of the United States Constitution, a plaintiff must establish that a 'case or controversy' exists 'between himself and the defendant' and 'cannot rest his claim to relief on the legal rights or interests of third parties.'" *Smith v. Frye*, 488 F.3d 263, 272 (4th Cir. 2007) (quoting *Warth v. Seldin*, 422 U.S. 490, 498–99 (1975))).

Foodbuy presents two theories for why it has standing. First, it argues that, as a general rule, a party that has privity to a contract has standing to make a claim for breach of that contract. To that end, Foodbuy asserts that GPI's failure to adhere to the pre-determined price structure affords it, as a party to the Agreement, standing to bring a case to enforce its terms, even if it would only be entitled to nominal damages should it prevail. Second, Foodbuy maintains that GPI's conduct deprived it of the benefit of the bargain by: (1) directly affecting Foodbuy's volume of sales; (2) directly affecting Foodbuy's fees earned for cost savings realized by its Committed Customers; and (3) depriving Foodbuy's Committed Customers of the pre-determined prices negotiated by Foodbuy and GPI.

Neither theory holds water. Foodbuy's first argument fails because "simply being a party to the contract does *not* alone establish Article III standing." *S. Walk Broadlands*

19

*Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 182 (4th Cir. 2013) (emphasis added). "An organizational plaintiff must still demonstrate *personal* harm both traceable to the challenged provisions and redressable by a federal court." *Id.*; *see also id.* at 183 ("Any consumer harm the arrangement causes injures Southern Walk's member households—not Southern Walk in its own right."). As the district court correctly found, Foodbuy claimed no personal harm in its Complaint due to GPI's alleged overcharging. *See* J.A. 20 ¶ 23 (alleging that Foodbuy "discovered that *Committed Customers[] paid higher prices* for the Products than those permitted" (emphasis added)).

Moreover, we need not reach Foodbuy's "novel contention that nominal damages alone, without any other cognizable form of relief, can create standing," *Deal v. Mercer Cty. Bd. of Educ.*, 911 F.3d 183, 190 n.5 (4th Cir. 2018), because it never asserted it was entitled to nominal damages in its Complaint. Instead, Foodbuy sought only one form of relief: a "refund for overcharges" presumably paid by its Committed Customers. J.A. 21. To be sure, Foodbuy did include a boilerplate request for "other and further relief as the Court deems just and proper," J.A. 22, but that language does not preserve a nominal damages claim when "'there is absolutely no specific mention in the Complaint of nominal damages.'" *Fox v. Bd. of Trs. of State Univ. of N.Y.*, 42 F.3d 135, 141 (2d Cir. 1994) (alteration omitted).

Foodbuy's second argument—that its Committed Customers' payments were reduced due to GPI's alleged breach—fares no better. Foodbuy never alleged in its Complaint that any actual or potential payment from Committed Customers to Foodbuy was reduced or eliminated because of GPI's alleged overcharging. And Foodbuy cannot

20

establish standing based on a theory omitted from its Complaint. *See Netro v. Greater Balt. Med. Ctr., Inc.*, 891 F.3d 522, 526 (4th Cir. 2018) ("[S]tanding is established by the facts alleged in the complaint.").

In sum, we agree with the district court that Foodbuy failed to show that it suffered any individualized harm as a result of GPI's alleged failure to sell its products to Committed Customers at the correct pre-determined prices under the Agreement. As a result, we affirm the court's dismissal of Foodbuy's overcharging claim for lack of standing.[12]

B.

We turn next to the district court's denial of Foodbuy's motion in limine to exclude GPI's damages calculation. Foodbuy argues here, as it did below, that GPI failed to timely disclose its damages computation (not merely an estimate) or Early as its damages witness, despite repeated requests for it to do so. Indeed, the first time Foodbuy received GPI's complete calculation of damages or its actual methodology for computing them was on the third day of trial. According to Foodbuy, this amounted to an eleventh-hour surprise, as evidenced by the district court's recognition on the record that the damages calculations should have been provided prior to trial.

---

[12] Foodbuy also argues that the district court erred in not granting its request in its Response to GPI's motion to dismiss that it be allowed to amend its Complaint to add a real party in interest—Foodbuy's parent company and largest Committed Customer—as a party to this matter. We disagree. Foodbuy never filed a motion seeking this relief. And "we cannot say that the district court abused its discretion by declining to grant a motion that was never properly made." *Cozzarelli v. Inspire Pharms. Inc.*, 549 F.3d 618, 630–31 (4th Cir. 2008).

21

Even if we agreed with Foodbuy's argument and assumed that GPI's introduction of its damages calculation and methodology amounted to a surprise, the district court nevertheless responded appropriately and cured any surprise by allowing the week-long recess. Federal Rule of Civil Procedure 26(a)(1)(A)(iii) requires a party to disclose "a computation of each category of [its] damages" and "make available . . . the documents or other evidentiary material . . . on which each computation is based[.]" Rule 26(e) requires a party to "supplement or correct its [Rule 26(a)] disclosure or response . . . in a timely manner if the party learns that in some material respect the disclosure or response is inaccurate or incorrect." And "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence . . . at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

Although district courts are accorded "'broad discretion' to determine whether a nondisclosure of evidence is substantially justified or harmless," such discretion is abused where it is clear that such nondisclosure caused surprise that could not be cured. *Wilkins v. Montgomery*, 751 F.3d 214, 222 (4th Cir. 2014).[13] We have little trouble finding that did

---

[13] In making this determination, we have instructed district courts to consider the following factors:

> (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the non-disclosing party's explanation for its failure to disclose the evidence.

*S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 597 (4th Cir. 2003). That said, we have never required the trial court "to tick through each of [these] factors." *Wilkins*, 751 F.3d at 222.

not happen here.

The district court fashioned an appropriate cure to any surprise arising from any delay regarding GPI's damages evidence. After it objected to Early's damages testimony, Foodbuy asked the court to "be allowed to put our rebuttal expert in to testify about her calculation about these damages." J.A. 1190. The court granted that request and gave Foodbuy a one-week recess to review GPI's entire evidence on damages (after already having allowed Foodbuy to begin its cross-examination of Early), saying that it wanted "to make sure that [Foodbuy] had adequate time to prepare to respond to Mr. Early." J.A. 1300. The court emphasized that it was doing so "to allow [Foodbuy's] rebuttal witness," who was in the courtroom for Early's testimony, "to hear the testimony of defense witness and to do her analysis, give her adequate time to do her analysis since she would be able to testify" a week later. J.A. 1204. The court also granted the request for a recess because Foodbuy was not prepared to fully cross-examine Early immediately following his direct examination.

Moreover, the court solicited input from Foodbuy's counsel to ensure that the proposed course of action would cure any surprise. In response, Foodbuy's counsel acknowledged that the court's approach "sound[ed] fair and reasonable." J.A. 1211–12. And, as noted, when the parties returned from the recess, Foodbuy neither requested more time nor asserted prejudice.[14]

---

[14] Foodbuy now claims it was harmed by not being able to use this intervening time to prepare its closing arguments. Because this was a bench trial, however, any prejudice resulting from Foodbuy's diversion of resources to focus on its rebuttal witness was, at

Based on this record, there is simply nothing to suggest that the district court abused its discretion in fashioning an appropriate remedy to cure any surprise to Foodbuy.

C.

We now consider whether the court abused its discretion in denying Foodbuy's request for leave to amend its answer to add a statute of limitations defense. Rule 15(a) provides that a party may amend its pleading with leave of court and such leave shall be "freely give[n] when justice so requires." "[W]hether or not a plaintiff should be allowed to amend his complaint to conform to the evidence . . . is a discretionary determination to be made by the district court, which determination [is] review[ed] for abuse of discretion." *Tucker v. United States*, 498 F. App'x 303, 307 (4th Cir. 2012) (per curiam) (citing *Quillen v. Int'l Playtex, Inc.*, 789 F.2d 1041 (4th Cir. 1986)); *accord Nourison Rug Corp. v. Parvizian*, 535 F.3d 295, 298 (4th Cir. 2008).

"[A]s a general matter, the defense of limitations must be raised by an affirmative defense presented in the answer or an amendment to the answer or it will be 'forfeited.'" *Woodson v. Allstate Ins. Co.*, 855 F.3d 628, 635 (4th Cir. 2017). And "the defense may be 'waived' by conscious and deliberate conduct indicating the wish not to present the defense or by the conscious and deliberate failure to present the defense." *Id.* Our review of the record indicates that Foodbuy was undoubtedly aware of the Agreement's effective dates at the time if filed its Answer. Thus, we find no excuse for its failure to include a statute-

---

most, negligible. *See* J.A. 1206–07 ("Closings don't have to be critical in this case because . . . it's not an ordinary case where you're closing in front of a jury.").

of-limitations defense at that time.[15] As such, we find that the district court was well within its discretion in denying Foodbuy's motion.

## D.

Next, we turn to the crux of this appeal: whether the district court erred in its interpretation of the Agreement. We "review[] 'de novo a district court's decision on an issue of contract interpretation.'" *Findwhere Holdings, Inc. v. Sys. Env't Optimization, LLC*, 626 F.3d 752, 755 (4th Cir. 2010) (quoting *Seabulk Offshore v. Am. Home Assurance*, 377 F.3d 408, 418 (4th Cir. 2004)). "When a contract term is clear and unambiguous, the express language of the contract controls its meaning[.]" *Biggers v. Evangelist*, 321 S.E.2d 524, 527 (N.C. 1984). That said, a contract term or phrase is ambiguous if it is susceptible to two different interpretations. *Woods v. Nationwide Mut. Ins. Co.*, 246 S.E.2d 773, 777 (N.C. 1978). In other words, for a term to be ambiguous, it must be "in the opinion of the court . . . fairly and reasonably susceptible to either of the constructions for which the parties contend." *Wachovia Bank & Tr. Co. v. Westchester Fire Ins. Co.*, 172 S.E.2d 518, 522 (N.C. 1970); *cf. Walton v. City of Raleigh*, 467 S.E.2d 410, 412 (N.C. 1996) ("Parties can differ as to the interpretation of language without its being ambiguous[.]"). To that end, "any undefined, nontechnical word is given a meaning consistent with the sense in which it is used in ordinary speech, unless the context clearly requires otherwise." *State v. Philip*

---

[15] Indeed, as the district court recognized, there was even less of an excuse for Foodbuy to wait to present this motion until several days into trial, after the Parties had already questioned witnesses. *See* J.A. 1068 (observing that this "last-minute affirmative defense[]" would be prejudicial because GPI "would have been asking lots of questions" relevant to it had Foodbuy asserted it earlier).

*Morris USA Inc.*, 685 S.E.2d 85, 91 (N.C. 2009) ("*Philip Morris I*") (internal quotation marks and alteration omitted).

"Interpreting a contract requires the court to examine the language of the contract itself for indications of the parties' intent at the moment of execution." *State v. Philip Morris USA Inc.*, 618 S.E.2d 219, 225 (N.C. 2005). "The heart of a contract is the intention of the parties, which is to be ascertained from the expressions used, the subject matter, the end in view, the purpose sought, and the situation of the parties at the time." *Gould Morris Elec. Co. v. Atl. Fire Ins. Co.*, 50 S.E.2d 295, 297 (N.C. 1948). And "[a]n examination reaching beyond the face of the whole contract to ascertain the parties' intent is necessary only when construing an ambiguous contract term." *Philip Morris I*, 685 S.E.2d at 93.

As noted earlier, the district court entered discrete, alternative holdings with regard to the Agreement. First, it held the Agreement's terms were unambiguous, and, under its plain language, required GPI to pay a volume allowance only for purchases made through Foodbuy's program (and thus at Foodbuy's price). Second, the court determined that should the Agreement's terms be found to be ambiguous, the same result would follow because the various methods of contract interpretation pointed to the same conclusion.

Foodbuy limits its argument on appeal only to the district court's first holding. It agrees with the court that the Agreement was a valid, unambiguous contract between the Parties. It nevertheless maintains that the court erred in its interpretation, which purportedly negates several parts of the Agreement, turns GPI's failure to honor prices into an excuse for nonperformance, and renders substantial portions of the Agreement surplusage. According to Foodbuy, the lynchpin of the district court's decision was price, which it

interpreted as the amount paid by Committed Customers. But the price paid by Committed Customers was not the contractual mechanism for determining whether GPI owed Foodbuy an allowance. In the Agreement, price was set for the benefit of Foodbuy and its Committed Customers—it was GPI's obligation to honor that pricing. And under the terms of the Agreement—which applied to "all invoices, purchase orders and other documents of purchase" and covers "any purchase and sale transaction between [GPI] and Foodbuy," J.A. 1562—GPI owed an allowance on *all* purchases of its products by Committed Customers purchasing through a Foodbuy Distributor, without exception.

At no point in its Opening Brief, however, does Foodbuy engage with the district court's alternative holding should the Agreement be deemed ambiguous. Instead, it assumes the language is plain, unambiguous, and should be interpreted in its favor.

In doing so, Foodbuy has thrown all of its eggs in the wrong basket because we find the Agreement to be ambiguous. Based on the Agreement's plain language, there is ample support for both GPI's and Foodbuy's constructions. In favor of GPI's interpretation, Section 2 makes clear that the Agreement applies to sales of: (1) certain products (2) sold at certain negotiated prices (3) to Foodbuy Distributors (4) who are buying on behalf of Committed Customers. Thus, based on this provision, it appears that GPI would owe an allowance only on those cases of juice bought under the Foodbuy program.

But Section 19 of the Agreement seems to favor Foodbuy's interpretation. There, the Parties agreed that the Agreement "shall apply to a*ll invoices, purchase orders and other documents of purchase* which Foodbuy or a Foodbuy Distributor purchasing on behalf of a Committed Customer may place with Seller, or which Seller may generate as a

27

result of a Product request, for the Products or other items purchased from Seller on behalf of Committed Customers." J.A. 1562 (emphasis added). Moreover, Section 19 provided that the Agreement "shall apply to *any purchase and sale transaction* between [GPI] and Foodbuy, a Committed Customer or a Foodbuy Distributor purchasing on behalf of Foodbuy or a Committed Customer." *Id.* (emphasis added). In other words, under this provision, it is arguable that GPI would owe an allowance on all cases of juice bought by Committed Customers or Foodbuy Distributors, regardless of the price at which they were purchased.

The divergence of these two Sections, when read in context of the Agreement as a whole, creates an ambiguity that we cannot resolve on its face. *See Happ v. Creek Pointe Homeowner's Ass'n*, 717 S.E.2d 401, 406 (N.C. App. 2011) (holding that even where the language of a contract is ambiguous, it is a "fundamental rule of contract construction" that the court "gives effect to all of its provisions, if the court is reasonably able to do so"). Stated succinctly, we are of the opinion that the Agreement is "fairly and reasonably susceptible to either of the constructions for which the parties contend." *Wachovia Bank & Tr. Co.*, 172 S.E.2d at 522.

Therefore, the proper framework for resolving the breach of contract claim involves the tools for interpreting ambiguous contracts. The district court undertook that analysis in its alternative holding wherein it concluded that the Parties' intent was to require GPI to pay a volume allowance on only those purchases made through the Foodbuy program at the negotiated price. As noted above, however, Foodbuy failed to present any argument in its opening brief taking issue with this facet of the district court's holding. As a result, we

28

conclude that it has waived any challenge to the district court's judgment on that ground, and we affirm. *See, e.g.*, *Brown v. Nucor Corp.*, 785 F.3d 895, 918 (4th Cir. 2015) ("'Failure of a party in its opening brief to challenge an alternate ground for a district court's ruling waives that challenge.'" (alteration omitted)).[16]

E.

Finally, we address GPI's argument that the district court wrongly denied its cross-claim alleging violations of the UDTPA. We review the district court's factual findings for clear error. *Nelson-Salabes, Inc. v. Morningside Dev., LLC*, 284 F.3d 505, 512 (4th Cir. 2002). However, we review de novo the legal determination of whether those facts constitute an unfair and deceptive trade practice under North Carolina law. *See, e.g., Gilbane Bldg. Co. v. Fed. Rsrv. Bank*, 80 F.3d 895, 905 (4th Cir. 1996); *Winston Realty Co. v. G.H.G., Inc.*, 331 S.E.2d 677, 681 (N.C. 1985). GPI seeks review only of the district court's legal determination.

Under the UDTPA, commercial entities can pursue treble damages against parties who commit unfair and deceptive trade practices or unfair methods of competition. To succeed on such a claim, the plaintiff must show that the defendant committed: "'(1) an unfair or deceptive act or practice, or an unfair method of competition[;] (2) in or affecting commerce[;] (3) which proximately caused actual injury to the plaintiff or to his business.'"

---

[16] Even if Foodbuy had not waived review of this portion of the judgment, we would still affirm for the reasons stated by the district court. *See Foodbuy, LLC*, 2018 WL 4603159, at *21–25. The court's holding with regard to the Agreement's ambiguous terms was fully supported by the myriad rules of contract interpretation it cited. As such, we find no error in its disposition of this claim.

*McLamb v. T.P. Inc.*, 619 S.E.2d 577, 582 (N.C. Ct. App. 2005). "'A practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.'" *Walker v. Fleetwood Homes of N.C., Inc.*, 653 S.E.2d 393, 399 (N.C. 2007). A practice is deceptive if it has a "tendency or capacity to deceive." *RD & J Props. v. Lauralea-Dilton Enters., LLC*, 600 S.E.2d 492, 501 (N.C. Ct. App. 2004). Though "'a mere breach of contract, even if intentional, is not sufficiently unfair or deceptive to sustain an action under'" the UDTPA, North Carolina courts have consistently held that a party may demonstrate and prove such a claim in conjunction with a breach of contract claim if it can show substantially aggravating and egregious circumstances attending the breach. *See, e.g.*, *Post v. Avita Drugs, LLC*, No. 17-CVS-798, 2017 WL 4582151, at *4 (N.C. Super. Oct. 11, 2017). Examples of such aggravating and egregious behavior include: (1) lying and concealing a breach combined with acts to deter further investigation; and (2) intentional deception for the purpose of continuing to receive the benefits of an agreement.

GPI asserts the district court committed two errors. First, GPI contends the court wrongly concluded that the ELR precluded its UDTPA claim by conflating it with GPI's tortious interference claims. Second, GPI argues the district court incorrectly concluded that it failed to prove sufficient aggravating circumstances to sustain a UDTPA claim. We agree with GPI on both points.

As to the first point, we find the district court erred in applying the ELR to GPI's UDTPA claim. The primary case on which the district court relied to do so simply does not support the ELR's application in this context. *See Legacy Data Access, Inc. v. Cadrillion,*

30

*LLC*, 889 F.3d 158, 164–67 (4th Cir. 2018) (dismissing the tort claim for conversion under the ELR while dismissing the UDTPA claim for other reasons); *Foodbuy, LLC*, 2018 WL 4603159, at \*28–29. That is unsurprising since, to date, the North Carolina Court of Appeals has limited the application of the ELR to negligence claims. *See Bradley Woodcraft, Inc. v. Bodden*, 795 S.E.2d 253, 258 (N.C. Ct. App. 2016). This conclusion is certainly reasonable given that the UDTPA is not a tort; it is "'the creation of statute'" and "'neither wholly tortious nor wholly contractual in nature.'" *Bernard v. Cent. Carolina Truck Sales, Inc.*, 314 S.E.2d 582, 584 (N.C. Ct. App. 1984) (alteration omitted). To the contrary, "an unfair and deceptive trade practices claim . . . is a different legal creature and not subject to the same defenses as traditional contract and tort claims." *Media Network, Inc. v. Long Haymes Carr, Inc.*, 678 S.E.2d 671, 683 (N.C. Ct. App. 2009).

We have previously cautioned that "the North Carolina courts have never addressed whether UDTPA claims are subject to the ELR, and in the absence of such direction, we are well-advised to rely on other grounds." *Ellis v. La.-Pac. Corp.*, 699 F.3d 778, 787 n.5 (4th Cir. 2012). And we see no reason to depart from the same circumspect approach here. We find the district court erred in rejecting GPI's UDTPA claim on this ground.

Turning to the question of aggravating circumstances, we also agree with GPI that the court erred in conflating GPI's UDTPA and fraud claims. "The elements required to be proved for fraud claims are dissimilar from those required under [the UDTPA]. Fraud contains elements of subjectivity of the perpetrator (intent) and the victim (actual reliance) . . . . [UDTPA] claims require neither intent of the actor nor actual reliance of the victim." *CBP Res., Inc. v. SGS Control Servs., Inc.*, 394 F. Supp. 2d 733, 740 (M.D.N.C. 2005);

31

*accord Marshall v. Miller*, 276 S.E.2d 397, 401 (N.C. 1981) (explicitly rejecting any possible implication that a party must show bad faith in order to recover treble damages for a violation of the UDTPA). "Furthermore, what constitutes an unfair and deceptive trade practice is a matter of law and requires less burdensome elements of proof than fraud." *CBP Resources, Inc.*, 394 F. Supp. 2d at 740 (internal citation omitted).

Given the district court's misapprehension of these threshold considerations, we will vacate and remand the judgment on this issue so that it can consider GPI's UDTPA claim in the first instance through a fresh lens in conformity with the holdings of this opinion. In doing so, we express no opinion on the merits of GPI's UDTPA claim.

III.

Accordingly, we affirm the district court's judgment in part, vacate it in part, and remand for further proceedings.

*AFFIRMED IN PART,*
*VACATED IN PART,*
*AND REMANDED*